THE STATE v. BUSTER THOMAS, Appellant.

Division Two, May 20, 1913.

1. **JUVENILE COURT: Venue: Defendant Under Seventeen: Transfer Without Examination.** The criminal court should not pass on defendant's application for a change of venue to the juvenile court, based on a statement that he is under the age of seventeen years, without determining his age.

2. ———: **Defendant's Age.** Where the evidence as to defendant's age is contradictory and unsatisfactory, the Supreme Court will not disturb the finding of the trial court, denying him a change of venue to the juvenile court.

3. ———: ———: **School Enumeration: No Diligence to Produce.** Where the defendant's right to have the case transferred to the juvenile court turns on the question of his being under seventeen years of age, the court may properly refuse to postpone the case to allow defendant time to obtain a certified copy of the school enumeration, where defendant had made application for the transfer and had failed to use reasonable diligence to obtain that evidence.

4. **CHANGE OF VENUE: As Fair Trial in County as Elsewhere.** If the trial judge is of the opinion that the defendant cannot obtain a fair trial in his county because of the prejudice of the inhabitants, he should not deny him a change of venue on the ground that he is of the opinion that he can obtain as fair a trial in the county as in any county in the adjoining circuit;

nor should he take into consideration prejudice against defendant in other counties, where there is no evidence before him of the existence of such prejudice.

5. ——————: **Publication of Confession: Indiscretion of Police.** It is an indiscreet act in the police to give out for publication before the trial the confession of a defendant, which tends to poison the minds of the public and arouse prejudice against him, and thereby destroy his chance of a fair trial.

6. ——————: **Prejudice of Inhabitants.** Defendant and six other negro boys were jointly charged with the murder of a white boy; and the evidence showed that the two white boys were returning late at night from a Priests of Pallas parade, along a boulevard, and when in a locality inhabited by negroes they were assaulted, and one of them was stabbed. Ten witnesses were called to establish the prejudice of the inhabitants of the county against defendant, each of whom had talked with from fifty to one hundred citizens of the county who had expressed extreme bitterness against defendant. One of them testified that his work brought him in contact with a large number of people, and that it was common talk that defendant should be hung without trial, that he ought not to be permitted to live twenty-four hours and that it would be a waste of money to try him. The other nine testified to having heard similar expressions of ill-will against defendant, although some of them were not positive that he could not obtain a fair trial. The State also called ten witnesses, some of whom were county or police officers and others private citizens, and they testified that they did not know and had not heard of any malice or prejudice against defendant, and that they believed he could obtain a fair trial in the county. A large number of persons called to serve as jurors in the case on their *voir dire* were found incompetent because they were possessed of such a settled conviction regarding the defendant's guilt or innocence that they could not give him a fair trial, or because of their prejudice. Several of the witnesses called by both sides testified that after they read the written confession of defendant, which was published in the newspapers of the city, they supposed there was no doubt of his guilt, and made up their minds accordingly. The crime was committed on October 3rd, and the trial did not occur until the following January. *Held,* that, considering the large population of the county, the discretion exercised by the court in refusing to grant a change of venue will not be disturbed.

7. **JURORS: Panel: No Negroes.** Where all the jury commissioners testified that they did not discriminate against the African race in selecting names of persons from whom the jurors would be selected to try the case, that they had approved some negroes for jurors, and that a larger per cent of white persons

State v. Thomas.

than negroes were approved for jury service because a great many negroes were found not to possess sufficient educational qualifications and those who did were ineligible to compulsory service, the challenge to the array and panel, on the ground of discrimination against persons of African descent, should not be sustained.

8. ————: ————: **Evidence of Number of Negroes: Not Drawn.** A proffer to prove by nine hundred negro citizens of the county that they were in all respects qualified for jury service, but had never been drawn, should be rejected; for, while it tends to prove the negro race had been discriminated against in the past, it did not tend to prove discrimination in the particular panel of jurors then in the wheel from which a jury was drawn to try appellant. And the same rule applies to the offer to prove how many negroes resided in the county.

9. **CONFESSION: Full Investigation of Voluntary Character.** A refusal by the trial judge, in the absence of the jury, to allow the defendant, before his written confession is admitted in evidence, to testify and to explain his mental condition when it was made, or to show by the testimony of others that it was improperly obtained, is error. So that where the chief of police had testified that neither he nor any other officer had used any violence, made any threats or held out any hope of immunity or leniency to bring about the confession, but also testified that defendant was kept in the custody of another officer at another police station the afternoon and night following his arrest and that officer quizzed him but was unable to obtain a confession, it was error to refuse to defendant's counsel permission to introduce, in the absence of the jury, other police officers and defendant himself to prove that the confession was not voluntary.

10. ————: ————: **Harmless Error.** But such error, in this case was not reversible, for the reason that, after the jury had been returned into open court, a full investigation was permitted, and the result of all the evidence is that the confession was admissible.

11. ————: ————: **Instruction: Presumed to be True.** In view of the fact that the confession can scarcely be said to be voluntary (owing to defendant's youth, the fact that he had not been previously arrested and the amount of interrogating necessary to bring it about), the court was not justified in instructing the jury that the confession spoke the truth and whatever the defendant said therein against himself was presumed to be true. Under the facts the defendant was entitled to an instruction telling the jury that, unless they found the written confession and admissions tending to prove his guilt were voluntarily made by him, they should disregard such confession and admissions.

12. ————: Involuntary: Prolonged Quizzing: Mental Anguish. It being a well known fact that most persons would rather be free and out of jail than under arrest and in confinement, it is only a matter of common sense to assume that a man under arrest, without a warrant having been previously issued, would not voluntarily admit his guilt and thereby insure the prolongation of his incarceration, unless he is encouraged to do so by hope of securing leniency or relief from physical or mental torture; and where the interrogatories are persisted in to an unreasonable extent, thereby producing mental anguish in the accused, the confession thus obtained should be wholly rejected as involuntary, the same as if it had been obtained by physical torture.

13. ————: ————: Burden. The burden is upon the State, in a preliminary examination before the court, to prove that a confession, made and signed by defendant after his arrest, was secured without the use of threats or violence or the promises of reward or leniency, and those words include such prolonged questions or importunities as render the confession involuntary.

14. ————: Obtained by Officer: Self-Incrimination. Under the Constitution statements made by an accused person when summoned before a coroner, grand jury or committing magistrate cannot be used against him on a trial of a crime under investigation when the statement was made; and while it is true that those constitutional guaranties against being compelled to testify against one's self do not apply to facts elicited by an officer through interrogatories propounded to a prisoner out of court, the distinction is more apparent than real. Where the accused is led to believe he is bound to make a statement in order to secure a surcease from the questions and importunities of the officer restraining him of his liberty, it would be a perversion of the meaning of the word to call such a statement "voluntary." The fact that defendant was a boy under seventeen years of age, and, being under arrest without a warrant, was subjected to almost continuous interrogatories during twenty-four hours, is almost sufficient to justify the trial court in rejecting the written statement signed by him as involuntary, as a matter of law.

15. ————: Voluntary: Collateral Matter. Whether or not the confession was voluntary is a collateral matter to its admission; and in such case it is defendant's duty to formulate and ask an instruction telling the jury that, unless they find the confession was voluntarily made, they should disregard it; and if such instruction is not asked, it is not error for the court to ignore that collateral matter. But that rule does not authorize the court to give an instruction placing the stamp of

truth upon the confession, and precluding the jury from considering the facts and circumstances under which it was obtained and whether or not it was wholly voluntary.

16. ———: Comment Upon in Instruction. The propriety or necessity of trial courts giving any instruction attempting to define the weight to be given to oral admissions or confessions against interest, in view of Sec. 5244, R. S. 1909, is gravely doubted.

17. INFORMATION: Several Coindictees: One Knife. An information charging that the several defendants assaulted, stabbed and killed deceased with a knife "which they in their hands held," is not insufficient because it was physically impossible for all six to have held one knife. It is not necessary to charge how a deadly weapon was held by parties using it to commit a crime.

Appeal from Jackson Criminal Court.—*Hon. Edward E. Porterfield,* Judge.

REVERSED AND REMANDED.

*Milford W. Rider* for appellant.

*John T. Barker,* Attorney-General, for the State; *Paul P. Prosser,* of counsel.

(1) The information sufficiently charges the offense of murder in the first degree. The manner in which the instrument is held, whereby the injury is inflicted, is not material; and even if the same were material under the common law rules of pleading, the defect is cured by the sweeping provisions of Sec. 5115, R. S. 1909, which declares that "no indictment or information shall be deemed invalid for any . . . defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits." State v. Bailey, 190 Mo. 276; State v. Shelton, 233 Mo. 229. (2) The question of appellant's age was addressed to the sound judgment and common sense of the trial judge, who had the witnesses before

him, with opportunities for judging their credibility
and determining the weight to be attached to their tes-
timony that are not afforded to this court.  The rec-
ord discloses no circumstances whatever indicating any
abuse of discretion on his part in this matter, and his
own personal observation and examination of appel-
lant, together with the latter's voluntary statements
after arrest that he was seventeen years old, are suffi-
cient to support the finding of the court that at the
time of his trial appellant was eighteen years of age,
and that the criminal court had jurisdiction of the
cause.  State v. Darling, 199 Mo. l. c. 198; State v. Mc-
Gee, 212 Mo. 101.  The court properly refused to de-
lay the trial in order to provide counsel for appellant
an opportunity to furnish the additional proofs sug-
gested in appellant's motion to transfer the case to the
juvenile court, consisting of the result of a fluoroscopic
examination to be made of appellant, and the enumera-
tion list of the colored public school of Cameron, Mis-
souri, for 1906.  The record shows that the question of
appellant's age had been fully determined by the court,
and after abundant opportunity had been afforded ap-
pellant to provide his proofs on that subject.  As a
matter that touched the very jurisdiction of the court,
appellant should have anticipated the question thus
presented, and been fully prepared to produce his evi-
dence with respect to the same.  The manifest lack of
diligence on the part of appellant in providing such
additional proofs fully warranted the refusal of the
court to receive them.  State v. Emory, 79 Mo. 462;
State v. Carter, 98 Mo. 180; State v. Thompson, 132
Mo. 319; State v. Woodward, 182 Mo. 422.  (3) While
the evidence on this issue in the present case tends to
show some public interest in the homicide, and some
sentiment against appellant and his codefendants, yet
it fails utterly to disclose such prejudice in the minds
of the inhabitants of Jackson county as to indicate that

the action of the trial court in denying the application for a change of venue was an abuse of discretion. State v. McCarver, 194 Mo. 734; State v. Vickers, 209 Mo. 27; State v. Sharp, 233 Mo. 283; State v. Rasco, 239 Mo. 551; State v. Barrington, 198 Mo. 85. (4) The testimony discloses a full and substantial compliance with the law on the part of the board of jury commissioners of Jackson county. The evidence thoroughly refutes appellant's groundless charge that the board had discriminated against negroes in the selection of the list of qualified jurors, and the motion to quash the array and panel was properly overruled. State v. Breen, 59 Mo. 415; State v. Riddle, 179 Mo. 294; Ullman v. State, 124 Wis. 602; People v. Sowell, 145 Cal. 292; State v. Daniels, 134 N. C. 641. As a further attack upon the authority of the board of jury commissioners, it is alleged in appellant's motions to quash the panel of twelve and in arrest of judgment that they "were and are holding two offices in conflict with section 18, article 9 of Missouri Constitution." We suggest that it may be seriously doubted whether a circuit judge is a "State officer" or an "officer of any county, city or other municipality," as the terms are used in that section. It would seem plain, however, that the circuit judges of Jackson county, and the judge of the court having jurisdiction in felony cases, as such jury commissioners, are not filling two offices, the public functions of which are inconsistent or incompatible, but are simply performing, *ex officio,* the duty of causing to be made, under their supervision, a list of qualified jurors for that county. State ex rel. v. Watson, 71 Mo. 470; State ex rel. v. Higgins, 125 Mo. 364; State ex rel. v. Bus, 135 Mo. 325; Bank v. Refrigerating Co., 236 Mo. 414. (5) Appellant assigns as error the action of the court in refusing to hear the testimony of appellant in connection with the question of the admissibility of his statement. The preliminary examination of Chief Griffin with reference to the cir-

cumstances under which appellant had made this statement, was searching and thorough, and the chief was subjected to an extended cross-examination by counsel for appellant. The court had fully determined the question, and properly refused to delay the trial by hearing appellant's testimony on the same subject, the nature of which could readily be anticipated. Appellant later availed himself of his privilege to testify in the case, and his repudiation of the statement, and his testimony in regard to the circumstances under which it was obtained, became a matter for the consideration of the jury. State v. Ruck, 194 Mo. 437. The abundant testimony on the part of the State shows that appellant's statements and admissions after his arrest were altogether voluntary. State v. Shackleford, 148 Mo. 506; State v. Vaughan, 152 Mo. 75; State v. Woodward, 182 Mo. 411; State v. Green, 229 Mo. 651. And conceding, for the sake of argument, that Chief Griffin told appellant, "You had better come through and tell the truth," etc., such language cannot possibly be construed as a threat or a promise, nor does it appear that appellant was induced to make his statement as a result of the same. State v. Hopkirk, 84 Mo. 284; State v. Bradford, 156 Mo. 97. (6) Instruction 6, in regard to the weight to be attached to appellant's statements and admissions, is in the familiar form which this court has approved in Banc. State v. Darrah, 152 Mo. 541; State v. Tobie, 148 Mo. 561.

BROWN, P. J.—Defendant and six others were jointly charged with the crime of murder in the first degree. From a judgment of the criminal court of Jackson county sentencing defendant to the penitentiary during his natural life he appeals.

On the night of October 3, 1911, two white boys (George Johnson and his brother, Elmer Johnson) were out on the streets of Kansas City until a late

hour viewing the "Priests of Pallas" parade. At the hour of 11:30 p. m., they were walking along Fifteenth street where the same intersects the Paseo, a locality inhabited by negroes, when they were accosted by a dozen or more negro boys who announced that the white boys had no business in "their territory." According to the testimony of Elmer Johnson, he and his brother kept on walking at a rapid pace until they were surrounded, assaulted and knocked down by the negro boys.

As quickly as they were permitted to do so the white boys escaped from their assailants and ran to a passing street car, when it was found that George Johnson had been stabbed in the heart by one of his assailants, from which wound he died a few moments later. When the street car arrived the negro boys all ran away and disappeared in the darkness. At that moment a man came along in an automobile and chased the negroes, but whether he found out who they were is not known as he was not called as a witness.

Neither Elmer Johnson nor the persons on the street car recognized defendant as one of the parties who assaulted and killed deceased.

Witness Dudley Jackson was sitting with a lady beside the street one block from where the tragedy occurred. He testified that about the time the killing occurred he saw and recognized defendant running past him—running very rapidly from the direction where the killing took place. Jackson was partially corroborated by the lady who was with him, but she did not identify the defendant. She saw three negroes pass; one was walking and two running. According to her testimony the two negroes who were running passed behind her and Jackson, while Jackson testified that defendant ran in front of them.

Frank Coleman, a ten-year-old newsboy, testified that he walked up behind defendant and another negro boy while the latter were standing on another street

about an hour after Johnson was killed, and heard defendant say to his associate: "If the police catch on to what we did to those two white boys they will kill us."

This was all the evidence directly tending to connect the defendant with the killing of Johnson, except some admissions and confessions alleged to have been made by defendant after his arrest, which will receive attention in the course of our opinion.

Defendant testified in his own behalf denying that he was on Fifteenth street and the Paseo when Johnson was killed. He denied that he took any part in the assault or killing, and also denied that he confessed his guilt to the police officers. He admitted going out to the parade on the night of October 3rd and remaining out until after midnight. He gave the names of three negro boys who, he says, were with him part of the time he was out, but he did not call them as witnesses.

Defendant's counsel have assigned thirty-three alleged errors in their motion for new trial, and several others in their motion in arrest but, notwithstanding this formidable attack on the judgment below, they have neglected to favor us with even a typewritten brief.

However, we have examined the voluminous transcript and will consider all the assignments which are worthy of serious attention.

I. Under section 6 of an act establishing juvenile courts in certain counties (Laws 1911, p. 181) it is made the duty of the criminal court and circuit courts to transfer causes to the juvenile court of Jackson county when it is found that the party charged with crime is under the age of seventeen years. Defendant insisted that the trial court pass upon his application for a change of venue before determining the age of defendant. The court did not err in overruling this insistence. The Juvenile

Juvenile Courts.

State v. Thomas.

Court Law of 1911 (Laws 1911, p. 177) was clearly intended to oust the criminal court and circuit courts of Jackson county of jurisdiction in all cases wherein the defendant was under seventeen years of age.

The criminal court heard the evidence of the mother, grandmother and aunt of defendant, and also admitted a Bible which purported to be the record of defendant's birth. The testimony of these witnesses was somewhat vague and unsatisfactory, and in the light of their evidence the birth record was a palpable fake. The grandmother testified that she bought the Bible new and had always kept it locked in her trunk. No one was allowed to write in it except her daughter, and she never wrote in it except to record the birth of defendant. However, on inspection the book showed that it had been extensively used and contained many marginal notations, evidently made by a minister of the gospel or theological student. The court found from inspection that the alleged date of defendant's birth had been recorded in this Bible a very short time before it was offered in evidence, and that defendant was above the age of seventeen years. There is nothing in the record which justifies us in disturbing his finding on that point. The school enumeration which defendant asked time to procure would probably have been competent evidence of defendant's age, but the defendant having failed to use reasonable diligence to secure a certified copy of that enumeration, the court properly refused to postpone the cause and allow additional time to obtain that evidence.

II. On a proper application for a change of venue based upon alleged prejudice of the inhabitants of Jackson county, embracing the 16th Judicial Circuit, the court heard twenty witnesses, having limited the number of witnesses to ten on each side.

Change of Venue.

The witnesses called by defendant embraced a railroad passenger agent, a real estate agent, a feed merchant, a deputy clerk of the probate court, an ex-clerk of the circuit court, a physician, two employees of a social club, a shoe salesman and a grocer. Each of these witnesses testified to having talked with from fifty to one hundred citizens of Jackson county who had expressed extreme bitterness against defendant. The evidence of the passenger agent, called by defendant, was to the effect that his work brought him in contact with a large number of people from all parts of Kansas City and from various stations in life, and that it was common talk among the people whom he met that the defendant should be hanged without a trial—that he ought not be allowed to live twenty-four hours, and that it would be a waste of money to try him.

The other nine witnesses called by defendant testified to hearing similar expressions of ill will against defendant, although some of them were not positive that defendant could not secure a fair trial in Jackson county.

In rebuttal of this testimony the State called two deputy marshals, four deputy clerks of the probate court, one deputy recorder of deeds, one superintendent of the court house, the counselor for the police board and the professor of an automobile school, who each testified, in effect, that they did not know and had not heard of any widespread malice or prejudice against the defendant, and that they believed he could obtain a fair trial in Jackson county. An echo of the alleged prejudice of the people of Jackson county against defendant was heard when the jury was impaneled. A large number of persons called to serve as jurors in the case were found incompetent because they were possessed of such a settled conviction regarding the guilt or innocence of the accused that they could not give him a fair trial. Of the eighteen persons first called for examination on their *voir dire,*

six were found incompetent on account of prejudice. Of course, these men did not state whether they were prejudiced for or against the defendant, but it is fair to infer that they were prejudiced against him. Several of the witnesses called by both the State and defendant testified that after they read the written confession of defendant, as published in the newspapers of Kansas City, they supposed there was no doubt of his guilt, and made up their minds accordingly. The record shows that on the day the alleged confession was signed copies thereof were supplied to the daily press and given wide publicity. While it was not a crime on the part of the police department to do this, it was certainly a very indiscreet act to make the confession public until it became necessary to do so in the prosecution of defendant.

The publication of such a confession tended to poison the minds of the very people who would have to be called as jurors to try defendant, and was likely to render it necessary to grant defendant a change of venue at great expense to both the State and defendant. It is commendable on the part of those charged with the enforcement of the criminal laws to ferret out crime, and secure, in all lawful ways, evidence which may be used in prosecuting law-breakers, but it is neither appropriate nor commendable, either before a defendant is called for trial or during the trial, to bring about such a condition of public opinion as to prevent a fair trial in the county where the crime is committed.

When the twenty witnesses gave their evidence the trial judge announced that he was satisfied defendant could obtain as fair a trial in Jackson county as in any adjoining circuit and overruled the application.

If the judge believed that such prejudice existed in Jackson county as to prevent a fair trial in that county (circuit) we do not think he could legally take into consideration the prejudice, if any, existing in some other circuit in passing upon the application for

change of venue, as there was no evidence before him as to the existence of prejudice in other circuits. After considering all the evidence on this point, we are convinced that immediately following the publication of the confession there was such a prejudice against defendant as would have prevented him from securing a fair trial in Jackson county had the cause been brought to trial at that time. However, the crime was committed on the 3rd day of October, and the trial did not take place until the following January; and, considering the large population of Jackson county from which a jury could be drawn, and the ruling of this court in the case of State v. Barrington, 198 Mo. 23, we do not feel justified in disturbing the discretion exercised by the court in refusing to grant a change of venue.

III. Defendant next filed a motion challenging the array and panel of jurors on the ground that the jury commissioners, in passing upon the qualifications of persons for jury service in Jackson county, discriminated against colored persons of African descent, in violation of article 4, chapter 64, Revised Statutes 1909, and the Fourteenth Amendment to the Constitution of the United States. All of the judges of the criminal and circuit court of Jackson county, except the judge trying the cause, were called as witnesses and testified that they did not discriminate against the African race in selecting names of persons from whom the jurors would be drawn to try this case. All of said judges, except one, testified, that they had approved some negroes for jury service, the precise number they could not remember. The gist of their evidence is to the effect that a larger per cent of white persons than negroes (according to the population of each) was approved for jury service because a great many negroes were found not to possess sufficient edu-

Motion to Quash Panel of Jurors.

cational qualifications for jury service, and that of the negroes found qualified from an educational standpoint a large per cent were either ministers of the gospel, school teachers or physicians, and, therefore, ineligible for compulsory jury service.

Defendant offered to prove by nine hundred negroes that they were in all respects qualified for jury service in Jackson county, but had never been drawn for such service. This evidence was rejected, and we think properly so, for the reason that while it would have tended to prove that the negro race had been discriminated against in the past, it did not tend to prove discrimination in the particular panel of jurors then in the wheel from which a jury was drawn to try defendant. The same rule applies to the offer of defendant to prove how many negroes resided in Jackson county. We hold that the evidence does not show such discrimination as would have justified the trial court in quashing the panel, and his action in overruling that motion is approved.

IV. This bring us to a consideration of the admissibility of a confession signed by defendant and introduced in evidence by the State. This confession is as follows:

**Confession.**

STATEMENT TAKEN IN OFFICE OF CHIEF OF POLICE.
Oct. 6, 1911.

State of Missouri, } ss.
County of Jackson. }

Buster Thomas being duly sworn on his oath states that he is seventeen years of age and that he lived at 1716 Virginia and that he now lives at 1723 Forest avenue in the rear. Affiant states that he was home when Clifford Wright came up there after him and that they went down to Eighteenth and Forest avenue where they met Leroy Patterson and Leon Johnson, known as the Mouse. That they all got on a car and went to Eighteenth and Grand avenue. That they then got off the car and walked north on Grand Avenue to Twelfth street, then west on Twelfth street to Walnut, north on Walnut street to Eleventh street, west on Eleventh street to Main and north on Main to Ninth street. Affiant states that they then went north

on Main street to Seventh and Main street to the Yale Theatre. After leaving the Yale Theatre they walked around awhile and then went back to Ninth and Main street where they witnessed the parade. Affiant states that after the parade they went to Shelly Park. That they went down Main street to Sixth street and east on Sixth street to Locust street, north on Locust street to Shelly Park, and that they staid at Shelly Park until about half-past ten or eleven o'clock p. m. Affiant states that the Mouse, Clifford Wright and himself then went south on Oak street to Fifteenth street, and at Fifteenth and Oak street this affiant separated from Leon Johnson, *alias* the Mouse, and Clifford Wright, but that he later met them at Fifteenth and Campbell streets. Affiant states that after he met Clifford Wright and the Mouse at Fifteenth and Campbell they all walked east on the north side of Fifteenth street to Fifteenth and Virginia where they met some more colored boys, among them Clarence Welts, Walter Blackburn, Sterling Hall, and that they all walked east on Fifteenth street to Fifteenth and Vine. That at Fifteenth and Vine they met some more colored boys, among them Raymond Scott, Floyd Nolan, Luther Scott and John Lackey.

Affiant states that between Vine and Highland on Fifteenth street they saw two white boys on the south side of the street who were walking west. That just as he saw the white boys he saw Clifford Wright and Clarence Welts cut across the street towards the white boys, and this affiant said to Wright and Welts, "What are you going over there for," and Wright said, "Going over there to run the white boys from the street." Affiant states that he then said to Welts and Wright, "You are going over there to start a fight and get into a lot of trouble," and that Wright then said, "It's none of your business." Affiant states that Clarence Welts then said to the white boys, "What business you all got over here, this is our part of town?" or something like that. Affiant states that Clifford Wright then struck one of the white boys and the white boy fell to the ground, and the other white boy ran and Clarence Welts ran after him. Affiant states that the white boy who had been knocked down got up and started to run towards his brother, running west towards Fifteenth and Paseo followed by Sterling Hall, who, as they reached the car tracks, struck at him with a knife and the white boy fell. Affiant states that he then ran out into the street and took the knife away from Sterling Hall and struck at the white boy with it himself, and that he then ran away. Affiant states that the white boy was still on the ground groaning and that he gave the knife back to Sterling Hall.

Affiant states that while he was taking the knife away from Sterling Hall and striking at the boy who was on the ground, Clarence Welts had the other white boy down by the path at the Parade corner of Fifteenth and Paseo waving a knife over him

and affiant states he heard Clarence Welts say, "What have you got to do with it?"

Affiant states the brother of the boy in the street got up and ran over towards the deceased and as he was running towards him, this affiant saw some one of the colored boys throw a bottle and another a brick at the boy, but this affiant says that he does not know who threw either the bottle or brick. Affiant states that he and the Mouse, Clarence Welts, Clifford Wright, John Lacky and Walter Blackburn, then ran south on the Paseo, and this affiant and Clifford Wright turned west on fifteenth street and went home.

BUSTER THOMAS.

Subscribed and sworn to before me, a notary public, within and for the State of Missouri, county of Jackson, this 6th day of October, 1911.

HENRY C. SMITH,<br>Notary Public.

My commission expires 3-5-14.
(Seal).

When the confession was offered in evidence defendant objected to its introduction on the ground that it was not voluntarily made, and saved his exception to the action of the court in admitting it.

To overcome the objection that the confession was not voluntarily made the State introduced Chief of Police Griffin, who testified that defendant was brought to his office about nine o'clock in the morning, and that the confession was made during the afternoon of the same day. About the only thing that Chief Griffin remembered saying to defendant to encourage him to confess was an admonition that if there were others implicated in the killing of Johnson not to bear all the blame himself but give the name of the other guilty parties.

Chief Griffin testified that while he had to call defendant three or four times before he secured the confession, defendant did not take the accusation seriously, but was laughing and grinning all the time as though he thought the whole transaction a joke. That defendant denied all knowledge of or participation in the killing of Johnson until he was confronted by one

of his co-indictees, who narrated the details of the murder and defendant's complicity therein. The Chief of Police further testified that neither he nor any other police officer used any violence, made any threats or held out any hope of immunity or leniency to defendant to bring about the confession. On cross-examination Chief Griffin admitted that defendant was not in his custody on the day he was arrested, but was kept in the custody of Captain Casey at Police Station No. 6 during the first afternoon and night following his arrest, and quizzed by Captain Casey, who was unable to secure any confession.

The jury was excluded during the examination of Chief Griffin, and at the conclusion of his evidence the court admitted the confession. Defendant's attorneys asked permission to introduce other police officers and also defendant to prove that the confession was not voluntary, but both of these requests were overruled and defendant saved his exceptions. We hold that the trial court committed error in refusing to allow a full investigation, in the absence of the jury, into all the facts tending to throw light on the admissibility of the written confession.

The testimony of Chief Griffin showed that defendant had been all of one night and part of two days in the custody of Captain Casey, and it was error to refuse to allow defendant to call Captain Casey or any other officer or detective who might have knowledge of facts tending to prove that the confession was not voluntary. It was also error to refuse to allow defendant to be sworn and testify to the circumstances under which the confession was obtained before admitting it. By statute the defendant is made a competent witness to testify to his knowledge regarding any issue in the case. [Sec. 5242, R. S. 1909; State v. Kinder, 96 Mo. 548.]

"A refusal, before the confession is admitted, to allow counsel for the prisoner to cross-examine the

witness as to the voluntary character of the confession; or to allow the accused to testify, and to explain his mental condition when it was made; or to show by the evidence of others that it was improperly obtained, is reversible error." [Underhill on Criminal Evidence (2 Ed.), p. 246.]

"Where the State introduces evidence which shows or tends to show that the confession was voluntary, the accused must be permitted to introduce evidence of any fact showing or tending to show that it was involuntary. He may call and examine, to aid in determining the admissibility of the confession, a witness who knows of the circumstances surrounding its making or of his physical or mental condition when it was made. The witnesses who testify to the circumstances showing that a confession was voluntary may be cross-examined by the accused on the same point, and it is error to refuse to permit him to do so. Counsel for the accused may also impeach the testimony of the witness testifying to the voluntary character of the confession by proving his former statements to the contrary." [12 Cyc. 481.]

A court cannot arbitrarily assume that the evidence of any witness will be false before he hears such witness. It matters not how great the interest of such witness in the result of the controversy, his evidence, if competent, must be heard and given the weight to which it is entitled.

However, we hold that the refusal of the court to hear all competent evidence offered on defendant's objection to the confession does not constitute reversible error in this case for reasons which will hereafter appear.

When the jury was recalled the court permitted defendant and all other witnesses offered by him to testify to the circumstances under which the confession was made. Captain Casey, who was in charge of Police Station No. 6, where defendant was confined

immediately after his arrest, testified that he questioned defendant twice before taking him to Chief Griffin, and that he was not able to get any admission from him that he was present when Johnson was stabbed. Casey was present during the following day when defendant was interrogated by Chief Griffin and assisted Griffin in that investigation. He also testified that no promise of immunity or threats were made and no violence used to secure the confession. The only difference between the evidence of Griffin and Casey is that Casey testified that defendant seemed to understand and appreciate the seriousness of the charge preferred against him, and that he did not see defendant laugh during the examination, while Griffin testified that defendant was laughing and grinning all the time as though the charge was a joke.

Henry C. Smith, counsel for the Board of Police Commissioners, who wrote out the confession signed by defendant, testified that no threats were made or violence used, and that no promise of immunity was made to secure the confession. Smith further testified that when John Lacky, a co-indictee, was brought into the presence of defendant and denied that he was implicated in the killing of deceased, defendant remarked to Lacky: "You know you were present when we killed that white boy." That defendant made this remark "in a laughing mood," and "seemed to treat it as a joke."

Henry Hobien, a reporter for the Kansas City Post, testified that he was present when defendant made and signed the confession, and that no threats or promises were made to secure the confession, but that one of defendant's co-indictees cursed defendant and came near striking him when defendant denied being implicated in the killing of Johnson. That Chief Griffin prevented defendant from being struck. Hobien further testified that he secured a copy of the con-

fession just in time for the evening edition of his newspaper.

The defendant testified that while he signed the confession, it does not correctly represent what he told Chief Griffin. That while he was at police headquarters he was frequently sent out of the presence of the chief into another room where detectives cursed and struck him and theatened to turn him over to a mob if he refused to confess; that by reason of such violence and threats he (defendant) was forced to make and sign the confession.

On cross-examination defendant was twice asked what officer or detective it was that struck him and threatened to turn him over to a mob, to which defendant replied: "I am not acquainted with the police force, I don't know nothing about it." While it is entirely probable that defendant did not know the names of the several detectives or officers of Kansas City, it is extremely probable that he could have given a more detailed account of the assaults, if such alleged assaults were really made.

The evidence of defendant as to the alleged threats and violence on the part of the detectives is so vague and unsatisfactory as to convey the impression that he was testifying falsely, or was too stupid mentally to give a correct account of matters within his personal knowledge. His evidence, considering his age, indicates that he is a boy of inferior intelligence.

Upon a careful consideration of all the evidence offered, we do not think the trial court erred in permitting the written confession to be read to the jury, and as the result of all the evidence shows that the confession was admissible, the error of the trial court in refusing to allow a full investigation of the facts concerning the confession out of the presence of the jury, was a harmless one, for the reason that if such full

investigation had been allowed it would have shown that the confession was admissible.

While we hold that defendant's written confession was, under the facts in this case, properly admitted, we do not hold that the court was justified in telling the jury in his instruction numbered six that it spoke the truth and whatever defendant said therein against himself was presumed to be true.

When the youth of the defendant is considered, the fact that he had not previously been arrested, and the amount of interrogating required to bring about the confession, we are almost justified in holding, as a matter of law, that the confession was not voluntary.

As to whether a confession is presumed to be voluntary when signed and sworn to by defendant is a matter upon which the authorities are not in harmony. 2 Wharton's Criminal Evidence (10 Ed.), sec. 622k; 12 Cyc. 480; State v. Jones, 171 Mo. 401; State v. Armstrong, 203 Mo. 554; but as a party while under arrest is not bound to make any statement regarding his guilt or innocence, even though he be directly accused (State v. Foley, 144 Mo. 600), and as it is a well-known fact that most persons would rather be free and out of jail than under arrest and confined, we think it is only a matter of comon sense to assume that a man under arrest would not voluntarily admit his guilt and thereby insure the prolongation of his incarceration without he is encouraged to do so by hope of securing leniency, or to secure relief from physical or mental torture. For these reasons we hold that when it appears that a confession was made and signed by a defendant after his arrest, the burden is upon the State in the preliminary examination before the court to prove that such confession was secured without the use of threats or violence or the promise of reward or leniency.

When a man is apprehended without a warrant having been previously issued for his arrest (as in the

case at bar), it is altogether proper for the police or other officers having him in custody to interrogate him and take his statement concerning his knowledge of the offense of which he stands charged. It is greatly to the advantage of the accused to be allowed to make such statement, because, if innocent, his statement or explanation may convince the officer that he is not guilty and thus secure his release without the expense of a trial, thereby saving both the State and defendant needless expense and annoyance.

We concur in what has been many times said by this court that a confession of guilt is not rendered involuntary and inadmissible because made in response to interrogatories propounded by an officer, nor because the interrogatories assume the guilt of defendant, nor because such officer pretends to have evidence of defendant's guilt when he has no such evidence. [State v. Barrington, 198 Mo. l. c. 109, and cases there cited. See also 2 Wharton's Criminal Evidence (10 Ed.), p. 1441; 12 Cyc. 468; and Underhill on Criminal Evidence (2 Ed.), p. 269.]

However, officers in trying to secure confessions or admissions from a party suspected of crime should not forget that they have no legal right to *compel* a person under arrest to make any statement whatever —that no one can be compelled to furnish evidence against himself, and where the interrogatories are persisted in to an unreasonable extent, thereby producing mental anguish on the part of accused, the confession or admission thus obtained should be wholly rejected as involuntary, the same as if it had been obtained by the infliction of physical torture.

It is a well-known rule of law that, under section 22, article 2, of our Constitution, and the Fifth Amendment to the Constitution of the United States, statements made by an accused person when summoned before a coroner, grand jury or committing magistrate cannot be used against him when he is charged with

the crime which the coroner, grand jury or committing magistrate had under investigation. [State v. Young, 119 Mo. l. c. 520; State v. Naughton, 221 Mo. 398; State v. Thornton, 245 Mo. 436; Counselman v. Hitchcock, 142 U. S. 547.]

We are aware that it is generally held that the constitutional guaranties against being compelled to testify against one's self do not apply to facts elicited by an officer through interrogatories propounded to a prisoner out of court, but we are convinced that the distinction is often more apparent than real. Both the Federal and State Constitutions are always liberally construed so as to prevent compulsory self-crimination.

A coroner or committing magistrate can inflict no greater punishment than to fine or commit a witness for contempt who refuses to testify, while a police officer possesses a right (at least the physical power) to restrain a prisoner and deprive him of his liberty temporarily, if he refuses to make such statement as the officer thinks he ought to make. Where the accused is led to believe that he is bound to make a statement to secure a surcease from the questions or importunities of those having him in charge, it would be a parody upon the word to call such a statement "voluntary."

What we have said pertains to the rights of all persons under the State and Federal constitutions. There are other reasons why confessions or admissions should not be extorted from the defendant by placing him in such physical or mental anguish as to overcome his will power. It has been proven by experience that confessions obtained in that manner are often untrue and unreliable.

In discussing this subject Mr. Underhill in his new work on Criminal Evidence, section 140, says:

"The practice of eliciting a confession by putting question after question to the accused is clearly not

conducive to the procurement of truth, and the mode in which the confession was elicited may always be considered by the jury to determine whether they shall believe it.

"This is well illustrated by the methods employed by police officers and others in practicing upon the accused after his arrest what is known in police circles as the 'third degree.' This usually consists in subjecting the acused, after his arrest and while in custody, to a continuous and rigid examination accompanied with intimidation by threats and other means. The length of this process and the manner of its application depend largely upon the character of the official who administers it and upon that of the accused to whom it is administered.

"Where, on the one hand, the police official is sufficiently hardened and brutalized by his past experience and the accused is a determined and courageous person, it is likely to continue for some lengthy period without results, but where the accused is weak and nervous or feeble in mind or body, the carrying out of this method of modern torture will generally result in producing statements in answer to leading questions which can readily be twisted into a confession.

"The worthlessness as evidence of such statements needs but to be stated in order to be appreciated. Their probative force, or rather lack of force, is well recognized by all who have had any experience of human nature."

What facts are necessary to render an extra-judicial admission or confession inadmissible as evidence, is a difficult rule to announce. In 12 Cyc. 464, it is said:

"Whether a confession is voluntary depends largely upon the facts of the particular case. If it is obtained by reason of oral threats of harm, by promises of benefit, *or by actions of those in control of the prisoner which are equivalent to such threats or promises,* it is involuntary and incompetent, and in

determining whether it was obtained by such means the sex, age, disposition, education, and previous training of the prisoner, his mental qualities, his physical health, and his surroundings are elements to be considered.''

See also Underhill on Criminal Evidence (2 Ed.), sec. 128.

The above rule announced by Cyc. and Underhill has been approved by this court in the case of State v. Fredericks, 85 Mo. l. c. 149.

The fact that defendant in this case was a boy not over seventeen years of age, and was subjected to almost continuous interrogatories during twenty-four hours was almost sufficient to justify a court in rejecting the statement and admissions as involuntary. The obnoxious practice of extorting confessions from prisoners suspected of crime has become so common that some States have enacted statutes declaring such confessions inadmissible unless the defendant be first warned that they will be used to convict him of crime. [Parker v. The State, 46 Tex. Crim. 461, l. c. 470.]

However, a reasonable presumption should be indulged that the trial court acted in good faith, and there being substantial evidence and circumstances on each side of the proposition in this case, the court did not err in permitting the signed confession of defendant to be read to the jury. However, under the facts disclosed by this record, the defendant was entitled to an instruction telling the jury that unless they found that the written confession and oral admissions tending to prove defendant's guilt were voluntarily made by him they should diregard such confessions and admissions. [State v. Stebbins, 188 Mo. 387, l. c. 398; State v. Moore, 160 Mo. 443, l. c. 460; State v. Brooks, 220 Mo. 74, l. c. 84; Underhill on Criminal Evidence (2 Ed.), sec. 126.] The word voluntary is so simple and in such general use no difinition of its meaning is necessary, and an attempt to define that word in an in-

struction would necessarily amount to an unwarranted comment upon the evidence.

The court neglected to give such an instruction, but its error in failing to do so does not entitle defendant to a reversal of the judgment.

While it is the duty of trial courts to instruct the jury without request upon the issues of law which directly arise in criminal cases, there are certain collateral issues which sometimes arise, and upon which the court need not instruct unless the defendant prepares and requests such an instruction. When the defendant is entitled to an instruction limiting or modifying the effect of evidence which has gone to the jury this raises a collateral issue which the court may ignore, unless the defendant prepares and requests an instruction defining the effect or weight to be given to such evidence. See the case of State v. Starr, 244 Mo. l. c. 176 to 183, where the authorities on this point are collated and exhaustively reviewed by FERRISS, J., who reached the conclusion that: "As to collateral questions, the parties must formulate and ask such instructions as they may be entitled to, and such instructions should embody the principle for which they contend. If improperly framed, the trial court should correctly reframe them, if the principle embodied is applicable to the facts." [p. 183.]

Defendant having failed to prepare and request any instruction informing the jury that they might disregard the written confession of defendant if they believed it was not voluntarily made, there would have been no error in this case of which he could complain if the court had ignored said confession in its instruction to the jury. However, on behalf of the State it gave instruction numbered 6, which reads as follows:

"If verbal or *written* statements of the defendant have been proven in this case, you may take them into consideration, with all the other facts and circumstances proven. What the proof may show you, if

anything, that the defendant has said against himself, is presumed to be true, because against himself; but anything you may believe from the evidence, the defendant said in his own behalf, you are not obliged to believe, but you may treat the same as true or false, just as you believe it true or false, when considered with a view to all the other facts and circumstances in the case.''

This instruction placed the stamp of verity and truth upon the written confession which the court had admitted, and precluded the jury from considering the facts and circumstances under which it was obtained and whether or not it was wholly voluntary. This was error highly prejudicial to defendant. If the court deemed it proper to make any comment on the written confession at all, it should not have ignored the protracted ''sweating'' by which it was obtained, but, under the facts shown in this case, should have told the jury that in determining what credit, weight and value they would attach to the alleged confession offered in evidence they might take into consideration all of the conditions, facts and circumstances under which the same was obtained, and that if they believed it was made voluntarily they might consider anything which the defendant said therein against himself as true; but if, on the other hand, upon a consideration of all of the said facts, conditions and circumstances, they believed, that the alleged written confession was not voluntarily made, they should disregard it altogether. We are not here losing sight of the well-settled rule in this State, which we reiterate, that the competency of a confession is primarily for the court, but that the weight and credibility to be given it in a case like this is for the jury. [State v. Brennan, 164 Mo. l. c. 510; State v. Stebbins, 188 Mo. 387.]

In the opinion of the writer there is grave doubt as to the propriety or necessity of trial courts giving

any instruction attempting to define the weight to be given to oral admissions or confessions against interest. Such instructions violate the plain letter and spirit of section 5244, Revised Statutes 1909, prohibiting courts from commenting upon evidence. We doubt if any citizen of Missouri was ever selected for jury service who was so grossly ignorant as not to understand that a statement against interest coming voluntarily from the mouth or pen of a litigant should be treated as true. We are aware of the long-established custom in this State of giving instructions defining the weight to be given to oral admissions against the interest of the party making same, and we would hesitate to reverse a case solely for an error of that character, but we believe trial courts should construe only legal documents and leave juries untrammeled in weighing oral evidence.

IV. Defendant's resourceful counsel moved to quash the information, and also to arrest the judgment on account of an alleged error in the information wherein it is charged that

**Information.**

the several defendants assaulted, stabbed and killed the deceased with a knife "which they . . . in their hands held." It is contended that all six of the indictees could not have held one knife. We regard this assignment as frivolous. It is certainly not necessary to describe how a deadly weapon was held by parties using the same to commit a crime. That part of the information objected to may be treated as surplusage and still leave a valid charge. [See State v. Cummings, 248 Mo. 509, and authorities there cited.]

Numerous additional assignments of error are found in defendant's voluminous motion for new trial. We have examined said additional assignments but do not deem them of sufficient importance to receive attention in this opinion.

For the error of the trial court in improperly commenting upon the written confession of defendant in its instruction, as hereinbefore quoted, the judgment will be reversed and the cause remanded for new trial. It is so ordered.

*Walker, J.,* concurs; *Faris, J.,* concurs in result.