## THE STATE v. HEUSACK, Appellant.

### Division Two, June 6, 1905.

1. **CIRCUMSTANTIAL EVIDENCE: Essentials to Conviction Upon.** In order to sustain a verdict founded upon circumstantial evidence, the facts and circumstances must be established beyond a reasonable doubt, and when so established, should point so strongly to the guilt of defendant as to exclude every other reasonable hypothesis.

2. ————: **Sufficiency: Murder.** The evidence in this case, which was a prosecution for murder in the first degree, is examined and held sufficient to justify a verdict of guilty, founded upon circumstantial evidence.

3. **DEFENDANT AS WITNESS: Conviction of Previous Offense: Cross-Examination: Instruction.** When a defendant becomes a witness in his own behalf, no error is committed in permitting the State to inquire of him, on his cross-examination, whether he had ever been convicted of a criminal offense. Such question is proper for the purpose of affecting defendant's credibility as a witness, and in such case it is proper for the court by its instruction to confine the jury's consideration of it to that purpose.

4. **INSTRUCTION: Circumstantial Evidence.** An instruction on circumstantial evidence, set out in the opinion, held not obnoxious to criticism.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse A. McDonald*, Judge.

AFFIRMED.

*Chas. J. Maurer* for appellant; *Chas. P. Johnson* of counsel.

Defendant testifies in his own behalf, denying the charge. On cross-examination, the State, over the objection of the defendant, was allowed to show that he was convicted of a misdemeanor twenty-five years ago, of which, however, he was pardoned. In addition to

this, the State, over the objections of the accused, was permitted to question him whether he was in Arkansas in 1886, knew a man named James G. Senate, at the same time charging, by explaining the question, that the defendant had been convicted in Arkansas, and this without the slightest proof. This was manifestly unfair, prejudicing the jury against the defendant, and objectionable under the law.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1) Instruction 4 is substantially in conformity with the law on circumstantial evidence in this State. State v. Gullette, 121 Mo. 452; State v. Avery, 113 Mo. 475. (2) The court did not err in allowing the State to ask defendant on cross-examination if he had ever been convicted of a criminal offense. He had offered himself as a witness and was subject to impeachment under the same rules and tests as are applied to any other witness. R. S. 1899, sec. 4680; State v. Blitz, 171 Mo. 530; State v. Thornhill, 174 Mo. 364.

GANTT, J.—The defendant was indicted at the April term, 1904, of the circuit court of the city of St. Louis, for the murder, in the first degree, of August Raphael, at said city on the 16th day of March, 1904.

The cause was regularly assigned for trial to Division No. 8 of said court.

The defendant was formally arraigned upon said indictment, and entered a plea of not guilty thereto, and on the 10th day of May, 1904, was put upon his trial and convicted of murder in the first degree. Motions for a new trial and in arrest of judgment were filed in due time, heard and overruled and exceptions properly saved, and from the judgment pronounced the defendant appealed to this court.

The evidence upon which the verdict and judgment

are based was circumstantial, and tended to prove the following facts:

August Raphael was murdered in his own home, at No. 2213 South Tenth street, in the city of St. Louis, between the hours of 11 a. m. and 1 p. m., on the 16th day of March, 1904. . He was then seventy-seven years of age, and his family, residing with him at that time, consisted of his wife, eighty-three years of age, and their grandson, Herman Raphael, about the age of seventeen years. The defendant Henry Heusack was the son-in-law of Raphael and his wife, and lived with his wife and son at No. 1759 South Eighteenth street in said city. Heusack was addicted to the excessive use of intoxicating liquor, and was somewhat under its influence on the day of the homicide.

The house in which Raphael lived was located on the west end of a lot twenty-five feet wide and extending from Tenth street on the east, to the alley on the west. The alley runs north and south, and connects with Ann avenue on the north and Shenandoah street on the south. On the east end of said lot, fronting on Tenth street, there was a building covering the full width of the lot, consisting of three rooms. This building was owned by Raphael, the deceased, and was rented and occupied by a club of twelve or fifteen young men, who met there for social purposes two or three ovenings each week. The Raphael home fronted on the alley and to the west. It was a one-story house with a basement. The basement was not occupied by the Raphael family. They lived in the first story, consisting of three rooms, the front room being next to the alley, a door opening from it to the middle room on the east, and a door from the middle room east to the kitchen. The kitchen and a kind of porch outside formed the east end of the Raphael home. Between this east end of the Raphael home and the west end of the building used by the club, there was an open space from thirty to fifty feet in length. But in this

space there was a shed on the south and an ash box, used as a flower bed, on the north, so that there was not much open space left. This space is referred to by the witness as the yard. There was a fence on the north side of this property. Entering the Raphael house from the alley (which was the only way it could be reached from the outside, save by going through the club rooms), there were four or five steps up to what was called a gangway, or aisle. This gangway was about four feet wide, extending along between the house and the fence on the north side. There was an outer door to the front room on the east and another outer door on the north of the kitchen along this gangway. The gangway led from the alley back to the yard, and the members of the club sometimes passed back and forth by that way. There was a door in the partition between the kitchen and the middle room, and another from the middle to the front room. In the northwest corner of the front room there was a bed in which the old lady, Mrs. Raphael, was lying sick, having been sick since about a month before Christmas. Old man Raphael kept chickens in the garret of his house, to which entrance was gained by means of a ladder from the yard. On the property next north of the Raphael lot, a Bohemian tailor, named Rhomatka, and his family resided, their house fronting on Tenth street alongside of the club building, and their yard extending back along the Raphael home. On the next lot immediately south of the Raphael lot, a lady named Ulrich lived. The evidence tends to show that for some time preceding the homicide, the defendant, Heusack, had not been on friendly terms with his father-in-law. About six months before, he said in a conversation with Henry Bene, ''My father-in-law put my wife up so she won't give me no money and I am going to kill the old son-of-a-bitch one of these days.'' About two or three weeks before Raphael was killed, Herman Raphael, the grandson, saw the defendant at the Raphael home. On that

day the defendant and old man Raphael had a quarrel. The defendant wanted to borrow some money and Raphael refused to let him have it and ordered him out of the house, saying, in German, ''Get out of my house, you damned old drunkard.'' At another time about a month before the homicide, Herman complained to the defendant that his grandfather was quarreling with his grandmother, and the defendant said, ''If the old son-of-a-bitch was young, he would lick the —— out of him.''

On Wednesday morning, March 16, 1904, the day of the murder, Herman Raphael left home about a quarter of seven, and went to his work for the St. Louis Cordage Company, leaving his grandparents alone at their home, his grandfather being up and around, and his grandmother sick in bed. About 3:30 in the afternoon he heard his grandfather had been killed and immediately returned to his home. The same morning Philip Bernhard and one or two other members of the club were in the club rooms, cleaning up the rooms, and making preparations for a box party to be given by the club the following Saturday night. Bernhard saw old man Raphael in the yard in the morning and talked with him. He saw him again a second time about five minutes before eleven o'clock as Bernhard was leaving the club rooms for home, going out the back way to the alley. The defendant testified that he called at the Raphael home between nine and ten o'clock in the morning, then went home and in about three-quarters of an hour returned. As Bernhard was leaving the premises about eleven o'clock, he met the defendant at the alley gate on his way to Raphael's the second time. The defendant asked Bernhard if the old man was home, and being answered in the affirmative, he went in and Bernhard went home. Mrs. Rhomatka and her daughter-in-law were washing that day. About half past eleven in the morning, while hanging out the clothes in the back yard, adjoining the Raphael home,

Mrs. Rhomatka heard a voice coming from the kitchen of the Raphael home, which she understood to be holloing, "Henry, Henry, Mamma, dead." This was repeated. She also heard a noise in the same place, "just like something was scratching." She immediately called her husband, and he, his seventeen-year-old son, Gus Rhomatka, and his daughter-in-law, Laura Rhomatka, all went out in the yard and listened. The four Rhomatkas testified at the trial. The elder Rhomatka and his wife could not speak English and testified through an interpreter. While there is a slight discrepancy as to the language they heard emanating from the kitchen, there is a substantial concurrence. Gus Rhomatka, who could speak and understand English, testified that the voice screamed, "O, Mama, O, Mama, I'm dead," and he also heard a noise "like with his feet kicking on the floor." The Rhomatka family had not lived there long and was little acquainted with the Raphael family. They knew Mrs. Raphael was sick, and supposed from what they heard that she was dying. A little after one o'clock, the elder Rhomatka asked one of the three young men who were in the club room, if he had heard that old lady Raphael was dead. Thereupon the young man requested Mr. Miller, one of their number, to go and see old Mr. Raphael. Miller knocked on the kitchen door, and receiving no response, he opened the door and saw the dead body of the old man lying on the kitchen floor in a pool of blood, a bloody hatchet lying by his side. Miller immediately told his companions and the three returned and together witnessed the evidence of the crime. They found all the inner doors closed, and opened them. Then they gave the alarm and notified the police.

When found, old man Raphael's body was lying with his face down, the right arm underneath and the left arm extending out with the hatchet across it, his head toward the door of the middle room. The hatchet, which had belonged to old man Raphael, was covered

with blood. A chicken killed by a cut in the back of the head, the way old man Raphael killed chickens, was found in the yard and the knife with which the chicken was killed was found on the table on the porch smeared with blood and feathers. The defendant testified on the witness stand that the old man told him when he was there that morning that he was going to kill a chicken.

Dr. Gradwohl testified that he was connected with the coroner's office as post-mortem physician. He performed the autopsy on the body of August Raphael, the deceased, on the 16th of March, 1904; that he was a white man and looked to be about seventy years of age. The principal injuries were upon the head; upon the back part of the head were numerous cuts in the scalp, one that ran from the top of the back part down to the right side of the nape of the neck; another one ran forward to the right ear and another one which ran to the left ear; below these the skull was fractured. The back part of the skull was completely caved in and the brain matter oozed out, and on the left temple, a depressed fracture, as if it had been made by some round instrument like the head of a hammer, about two and a quarter inches in diameter, and from this point where the skull was fractured there were lines of fracture leading down to the base of the skull. There were several fingers fractured. The end of the little finger was broken and the second bone of the second finger. From the character of the wounds, some of them were made with the sharp edge of a dull instrument. The man's death was caused by the fracture of the skull and hemorrhage into the brain; the back of the head was all caved in.

The defendant lived about eleven or twelve blocks from the Raphael home. He went to the Raphael home three times between nine and one o'clock of that day. He testified that he had work at the arsenal, and that he started for that point between nine and ten in the

morning, and that his wife told him to stop on the way and see how her mother was. He went to Raphael's, but did not go to the arsenal. He returned to his home and in three quarters of an hour and after having had five or six drinks of liquor that morning, he again wanted to go to the arsenal, saying to his wife, "I must go to the arsenal to-day because they are going to start up to-day, and I work there." At eleven o'clock Bernhard met defendant at the alley gate of the Raphael home. The defendant asked Bernhard, "How is the old man in there?" This time, he testified, he remained but a few minutes, but again he went home and did not go to the arsenal. The third time, about one o'clock, he started for the arsenal again. Mrs. Ulrich saw him come down the alley and when he got to the Raphael gate he stood there awhile and looked in. The defendant testified that his reason for calling on the Raphael's the third time, on his way to the arsenal to work, was to tell his mother-in-law "that we (meaning his wife and himself) intended to spend the afternoon there." That when he went in the Raphael home the third time, he entered by the front room and told his mother-in-law that his wife would soon be down; that his mother-in-law asked him to go in and see what the old man was doing, as she had not seen him for a long time; and that he went into the kitchen, saw the evidence of the crime and ran back, out of the house, and home, without ever telling any person of the crime, not even his mother-in-law. Then he said he told his wife what he had seen and hurried back to the Raphael home, in advance of his wife. When defendant arrived at the Raphael home the fourth time, he found a number of people gathered at the scene of the crime. He first asked, "What the hell is the matter here?" and then told the people that he had been there twice that morning and that "the old man was all right this morning." The police officers soon arrived at the scene. They discovered fresh blood spots on the defendant's

ear, neck, cheek, between his fingers and on his shoes. There is evidence that the defendant stepped in the blood on the floor after the arrival of the police, but the evidence further shows that at that time the blood had dried and stiffened so that by stepping in it at that time it would not have made the spots upon the person and the shoes of defendant as found thereon. The defendant first denied that there was blood on him, and when they started to take his shoes off, he wanted to rub his shoes on his leg. The officers asked the defendant many questions, his name, where he had been, who killed this man, how he got blood stains on his shoes, neck and ear, to all of which he either refused to answer or said, ''You are smart and wise, go and find out,'' or ''It's none of your business,'' or ''Go find out, that is what you are paid for.''   .

The officers thereupon took the defendant in charge, and on the way to the police station, Bernhard was in the patrol wagon with defendant and defendant said to him, ''Do not say anything, we will explain it down at the station.'' ''These fellows are so wise let them find out.''

At the close of the evidence for the State, the defendant demurred to the evidence, which demurrer was overruled by the court, and defendant excepted, and thereupon the defendant went on the witness stand in his own behalf. In addition to the statements of his already noted as to his presence in the house of old man Raphael between nine and ten o'clock in the morning and about ten or fifteen minutes to eleven, he says he went back to his father-in-law's about one o'clock, went into the front room and saw the old lady first and told her that her daughter, defendant's wife, would be down in a few minutes. The old lady said to him, ''Come in and see what the old man is doing.'' That he went into the kitchen and saw the old man there and walked up to him and saw blood all around there and I got hold of him and then I run out as fast as I could

and told my wife something had happened to papa down there, she grabbed a shawl and threw it over her head, and we both went down there. I talked with my father-in-law nearly every day for the last six months; he always spoke German, called me Heinrich, the German for Henry. I never told Mr. Bene six months ago that I would kill my father-in-law some day, or words to that effect, never made any threatening remarks of that kind; I heard Herman Raphael testify; never told him that I would give my father-in-law a beating; my father-in-law and I were the best of friends; I cut my finger on Sunday morning, March 13th, and if there was any blood on my person any place, the only way I can account for it is when I first went in there and tried to pick my father-in-law up.

On cross-examination he stated he did not go to the arsenal, but went to Seventh street and Shenandoah, met a friend at Seventh and got as far as Broadway, and I changed my mind and went back home; had a couple of drinks on my way back before I went home; then I wanted to go back to the arsenal and my wife did not want me to go out of the house and I said, "I must go to the arsenal to-day, because they are going to start up to-day;" I worked there; then I went back to Raphael's the second time; I went down through the alley and into the house; saw my father-in-law this time; he was in the middle room; I talked with him just a minute; then I went back home, did not go to the arsenal; it must have been ten or fifteen minutes to eleven when I got down there this time. Admits he saw Bernhard, and asked him, "How is the old man in there?" Bernhard said, "I do not know;" that he just merely asked the question; he went on in, found the old man in there, and the old man told him he was going to kill a chicken, and he asked the old man if he wanted him to take it home, and he answered, "No, Emma would be down there pretty soon and it will be too much trouble anyway;" the defendant asked him to let him

take the chicken home, the defendant's wife could fix it up better than he could, and the old man replied, "No, I will attend to it myself," to which defendant said, "All right," and then went away. He says, "I guess I closed the door as I went out, I think the old man was in the kitchen. Bought some whiskey that morning at Eighteenth and Geyer; I had taken about three or four drinks before I went down there the second time, about five or six drinks in all, not of whiskey, I drank two glasses of beer, felt the effect of it, but not much." It was a little after one o'clock that he discovered the dead body of the old man; I did not tell any person in the neighborhood when I discovered the old man with his brains knocked out; did not call the police, or the tailor; I just run home; I did not tell the people there when I came back I had been there twice that morning; I did say, "I saw the old man all right this morning;" did not tell the officers, when they asked me how I got blood on my face and shoes, that it was none of their business; if I said that, I don't know it. He was asked if he had ever been convicted of a crime, and answered, "No, sir." His counsel objected to this question, and the court ruled he could answer; he then stated, "I was convicted here once in St. Louis, and then pardoned, for a misdemeanor; that was twenty-five or thirty years ago. I never was convicted in Arkansas; I do not know a man by the name of Jas. G. Senate."

Other facts and the objections to the instructions will be noted in the course of the opinion.

1. The heinousness of the crime of which the defendant was found guilty by the jury in the circuit court, and the gravity of the consequences to him, alike call for the most serious consideration.

The verdict is founded upon circumstantial evidence alone, and the law in such cases is that in order to sustain a conviction the facts and circumstances must

be established beyond a reasonable doubt, and when so established, should point so strongly to the guilt of the defendant as to exclude any other reasonable hypothesis. That old man August Raphael was murdered in his own home between the hours of eleven a. m. and one p. m., of the 16th of March, 1904, there cannot be, in view of the evidence in the case, a reasonable doubt. The character of the wounds and the nature of the instrument by which they were produced excludes all idea of self-destruction, and indeed the able counsel for the defendant make no claim that the old gentleman came to his death by suicide, and the facts in evidence likewise forbid the conclusion that his death was the result of an accident or mishap.

We have, then, the *corpus delicti* established beyond a reasonable doubt. It remains to be seen whether the evidence on behalf of the State established the criminal agency of the defendant, in the perpetration of the crime, for while it may be conceded that the old gentlemen was murdered in his own home, and by a hatchet belonging to him, unless the evidence was such as to justify the jury in reaching the conclusion that the defendant was his murderer, then the conviction ought not to stand. Was there such a failure of testimony on the part of the State? When we consider the age of the deceased, an old man seventy-seven years of age, and his simple life, residing alone with his aged wife and grandson, we naturally look for some motive in the perpetration of the crime. While a want of motive is no excuse for a crime when it is clearly established, it is often said that in a case depending mainly upon circumstantial evidence the want of a motive is an important consideration bearing upon the probability of guilt, but the investigation of human motives has found it to be a matter of great difficulty, and experience shows that aggravated crimes are sometimes committed from very slight causes and often without any apparent or discoverable motive. The character, in-

stincts and intents of persons differ so much that what
might be an adequate motive for one for a certain act
would be none at all for another. In this case the pros-
ecuting officer with commendable diligence brought be-
fore the jury all the facts and circumstances obtainable.
From this evidence it appears that the old gentleman
lived in his little home all alone with his sick wife and
a grandson, about seventeen years of age. The evi-
dence discloses beyond a peradventure of a doubt that
this grandson did not commit the crime, because he left
home early that morning, and his grandfather was seen
alive up to about eleven o'clock, and this boy during
all that time was engaged in his work with the Cordage
Company, and was there when notified of his grand-
father's death. There is nowhere in the whole record
any suggestion of any ill-will harbored against the old
man by any other person than the defendant. The de-
fendant was his son-in-law, and the evidence tends to
show that he was addicted to the use of liquor and that
he was more or less thriftless, and had some two or
three weeks prior to the homicide endeavored to bor-
row some money from the old gentleman, and the old
gentleman told him that he did not have any money,
and told him "to get out of the yard." Witness Bene
testified that some six months before the homicide, the
defendant told him that his father-in-law had put his
wife up so she would not give him any money, and that
he was going to kill the old son-of-a-bitch one of these
days. At another time, and about a month before the
old man was killed, Herman, the grandson, complained
to the defendant that his grandfather was quarreling
with his grandmother, and the defendant said, "If the
old son-of-a-bitch was young he would lick him." From
these expressions it appears that there was a bad feel-
ing on the part of the defendant toward the old man.
The evidence tends strongly to show that, after the old
man refused to loan money to the defendant, the de-
fendant ceased to visit him, at least he was not known

to the neighbors, who lived immediately adjoining the old couple. On the day of the homicide it appears that the defendant made three distinct trips to the Raphael home alone. His account of himself and his movements on that day were very unsatisfactory; he started out on each occasion he says to go to the arsenal to go to work, and each time landed at the Raphael home, and admits that he never succeeded in reaching the arsenal although there was nothing to hinder him in so doing. Certain it is that he was the last man seen to go to the Raphael home, and that but a few minutes before the murder must have occurred, keeping in mind the time when he was last seen to go into the Raphael home. The evidence places him there when the Rhomatka family were directed by the voice calling out "Mamma, Mamma, I am dead," or "Henry, Henry, Mamma, dead," and heard sounds of heavy stamping and as if someone was scratching within the kitchen. And there is added to the admitted proximity of the defendant to the scene of the tragedy, the blood stains on the lobe of the ear and on his face, hands and shoes, and the strange story of the defendant that when, at the request of the old lady, he went to the kitchen to see the old gentleman and discovered him murdered, he ran out of the house eleven blocks away to his own home without giving any alarm to any of the neighbors or police officers, and without even notifying the wife of the deceased. But this is not all. His conduct and actions when he returned the fourth time to the Raphael home, and found there the neighbors, who had gone, as they supposed, to the assistance of the old man, because they believed his wife was dead, were strongly indicative of guilt. According to his own testimony he had been in this house and knew that his father-in-law lay murdered therein, and yet upon his arrival at the house this time he greeted the assembled neighbors with the query, "What the hell is the matter here?" He then told the people that he had been there twice that morn-

ing and that the old man was all right then. If inno-
cent and he had discovered the murder of his father-in-
law, a natural sense of horror would have indicated
that he should have at once given the alarm to the
neighbors and called the officers of the law to ferret out
the murderer. If innocent, why ask what was the mat-
ter there when he saw that the neighbors had discov-
.ered the murder of the old man, and were there to ren-
der what aid they could to the hapless old wife? If
innocent, why should he have dissembled and stated
that he had been there only *twice* that forenoon when in
fact had been there *three* times. The presence of fresh
blood stains on the defendant's ear, neck, cheek, fingers
and shoes were physical facts entirely consistent with
the theory of the State that he himself was the perpe-
trator of this murder. If, as the facts tend to indicate,
he slew the old man with the hatchet which was there
in the kitchen, and which bore the signs of blood and
hair upon it, nothing would have been more natural
than that the blood from the old man's wounds in the
head would have spurted on his face, neck and hands
as he stood close enough with the short-handled hatchet
to inflict the murderous wounds in the head. Unsatis-
factory in the extreme was his explanation to the of-
ficers of the presence of this blood on his face, ear and
neck. He showed a cut on his right hand which he
said he had received on the previous Sunday, which the
officer testified looked like an old cut. His effort to re-
move the blood from his shoes by attempting to rub
his shoes against his pants, when the officer started to
take his shoes off of him, evinced a purpose of obliterat-
ing the damning evidence against him, and he betrayed
his appreciation of the weight of this evidence when he
charged the officers, then and there, with trying to put
up a job on him, because they were endeavoring to pre-
serve the blood stains on the shoes just as they ap-
peared when they arrested him. It was also very sig-
nificant that he should step into the blood of the mur-

dered man after the officers had arrived at the house and in this manner account for the blood upon his person, but unfortunately for him, and fortunately for the State, the blood had then become so dry and stiff that it would no longer spatter when he stepped in it and produce the blood spots which the officer described as splashes and not thick, congealed blood. But the most unnatural feature in defendant's conduct was the manner in which he treated the officers when they were inquring for evidence upon which to apprehend the murderer of his father-in-law. Instead of gladly rendering any and all assistance to enable them to ascertain who the murderer was and willingly giving them all the information as to his relation to the old man, and when he had last seen him alive, and under what circumstances, strange enough he answered them, "You are smart and wise, go and find out who murdered him," and to another, "It is none of your business," and still to another, "Go find out, that is what you are paid for." Nor did he cease at this; as he rode to the police station with young Bernhard, he cautioned him to say nothing, saying, "These fellows are so wise, let them find out." These expressions to the officers have none of the earmarks of innocence; they disclose none of that natural anxiety to discover the murderer of his wife's father, whose cruel taking off would have aroused a natural desire on his part to see the murderer caught and punished; on the contrary, they evinced a mind and heart devoid of natural affection and insensible to the enormity of the crime that had been committed. Doubtless it appeared to the jury that these speeches sprang from the sense of guilt and a desire to thwart the discovery of the murderer, and that one related, as the defendant was, to this old man, who could indulge in such conduct toward the officers of the law, would have had little hesitation in doing the murder himself if an opportunity presented itself. He utterly and insolently refused to render any assistance toward the apprehension of the

guilty party, and obstructed every effort of the officers in their investigation. With this array of facts and circumstances before them and with the additional advantage of seeing and observing the witnesses and their manner of testifying, it cannot be said that the jury were not authorized to find a state of facts beyond a reasonable doubt which were not only consistent with, but tended with all reasonable certainty to point to the defendant as the person who killed August Raphael, and when such a state of evidence appears it is not the province of this court to substitute its judgment for that of the jury and direct an acquittal. On the contrary, the rule is too well established to require a citation of authorities, that if there is substantial evidence to uphold the verdict, this court will not interfere with it.

II. Among other errors assigned defendant complains of the cross-examination of the defendant. In his cross-examination, counsel for the State inquired of defendant: "Have you ever been convicted of a crime?" to which the defendant answered, "I was convicted here once in St. Louis, of a misdemeanor, and was pardoned; that was twenty-five or thirty years ago." Q. Have you ever been convicted but that once? A. That is all. Q. Were you ever convicted in Arkansas? A. No, sir. Q. Did you ever know a man in Arkansas by the name of Jas. G. Senate? A. No, sir. Q. Were you in Arkansas about '86? Counsel for the defendant: *I object to that question as being incompetent and immaterial; it throws no light on this transaction at all.* The Court: *I do not know the purpose of it.* Counsel for the State: *The purpose of it is to continue on the question I asked him about this man Senate, and with reference to that conviction I asked him about in Arkansas.* The Court: *He may answer the question;* to which ruling the defendant duly excepted. It is insisted that this examination was highly prejud-

icial and that the explanation of its purpose was but a clever charging that the accused was convicted in Arkansas. In connection with this assignment the defendant complains of instruction six which reads: ''You are further instructed that you are to consider the evidence which was introduced tending to prove that the defendant was previously convicted of a criminal offense solely for the purpose of discrediting defendant as a witness, and you are not to consider that evidence as bearing upon the question of his guilt of the crime charged in the indictment herein. And you should not permit that evidence to influence you against defendant.'' It is urged that the effect of this instruction was to cause the jury to believe the defendant had been convicted of a criminal offense in Arkansas, when in truth there was no evidence offered to prove that he was thus convicted. There was no error in permitting the State to inquire of the defendant, after he had become a witness in his own behalf, whether he had ever been convicted of a criminal offense. Section 4680, Revised Statutes 1899, expressly provides that such conviction may be proved to affect his credibility by his own cross-examination. And it was ruled in this court in State v. Blitz, 171 Mo. l. c. 540, that a conviction of a misdemeanor might be shown in this manner, as well as of felony. And that ruling was approved in State v. Thornhill, 174 Mo. l. c. 370. Now in this case the question sought to elicit proof of a prior conviction resulted in showing the defendant had been convicted of a misdemeanor in St. Louis, some twenty-five years before the trial. All questions as to the conviction in Arkansas were answered in the negative, and no attempt was made to contradict the defendant as to them. The State had the right to ask the question, and having received an unfavorable answer, its tendency was to injure the State and establish that there had been no conviction of defendant in Arkansas, hence no reversible error can be predicated upon the cross-examination

aforesaid. Neither was there any error in giving the instruction six. We do not think it can fairly be considered as referring to a conviction in any other criminal offense than the misdemeanor which had occurred some twenty-five years previously in St. Louis, and the court carefully and properly restricted the evidence of the conviction of a misdemeanor to the one purpose of affecting the credibility of the defendant as a witness, and forbade the jury's considering it upon the question of his guilt of the crime for which he was being tried. This instruction was manifestly given as a protection to the defendant, and it could not have operated otherwise.

III. Objection is also made to the fourth instruction. That instruction is in these words: "You are instructed that it is not necessary to prove the defendant is guilty by the testimony of the witnesses who may have seen the offense committed. Guilt may be shown by proof of the facts and circumstances from which it may be reasonably and satisfactorily inferred. In determining whether the defendant is guilty or not, you should take into consideration all the facts and circumstances in evidence, the acts and conduct of the defendant, and his motive, if any, for doing or not doing the act charged as shown by the evidence, and if you find from all the facts and circumstances in evidence that there is no other reasonable conclusion than that he is guilty, you will so find, but to convict the defendant on circumstantial evidence alone the circumstances proven must be consistent with one another, and must, taken together, point so conclusively to his guilt as to exclude every reasonable hypothesis of his innocence." That part of the instruction complained of is as follows: "You are instructed that it is not necessary to prove the defendant guilty by the testimony of the witnesses who may have seen the offense committed." The argument of the defendant is that this is an implication

State v. Heusack.

that eyewitnesses saw the defendant commit the crime, but in this case it was not necessary to bring them into court. We can but regard this as a strained and hypercritical criticism of the instruction. If the article "the" before the word "witnesses" had been omitted, there could not possibly be any valid objection to the instruction; it would then have told the jury that it is not necessary to produce direct and positive evidence to convict one charged with crime, but that it is sufficient if facts and circumstances are proven from which no other reasonable conclusion than the guilt of the accused can be reached. The argument of the defendant against this instruction would be just as forcible if the word "the" had been omitted, because the inference that there were eyewitnesses, according to defendant's construction of the instruction, would still remain. In this case there were no eyewitnesses and nothing to induce the jury to believe there were. Read as a whole, and considered altogether, the instruction conveyed simply the idea that it was not necessary, in order to convict, that his guilt should be established by direct evidence, but may be shown by proof of facts and circumstances from which no other reasonable conclusion than his guilt could be reached. The other instructions in the case, together with his fourth instruction, fully and fairly covered all the propositions of law arising in the case and left nothing more to be desired. We have gone carefully through the record in view of the serious charge against the defendant, and our conclusion is that he has had a fair and impartial trial, and that the sentence which the law pronounced must be executed, and it is so ordered.

*Fox, J.,* concurs; *Burgess, P. J.,* absent.