THE STATE v. JOSEPH C. HANCOCK, Appellant.—104 S. W. (2d) 241.

Division Two, April 21, 1937.

*Charles Farrington* and *Fred Stewart* for appellant.

*Roy McKittrick*, Attorney General, *Wm. Orr Sawyers*, Assistant Attorney General, and *Aubrey R. Hammett* for respondent.

BOHLING, C.—Joseph C. Hancock appeals from a judgment imposing a sentence of life imprisonment for the murder of Irene Hancock, his wife, at Springfield, Missouri.

Defendant has filed no brief. His motion for new trial contains assignments of alleged error in sixteen paragraphs. We proceed with the briefing of these assignments on behalf of defendant and their determination.

The testimony covering defendant's criminal agency is wholly circumstantial. Its sufficiency is questioned.

The evidence stands uncontradicted that deceased died from strychnine poisoning. It also established that a $5000 life insurance policy was carried on the life of deceased, providing for double indemnity in case of death by accident, with the daughter of deceased (a child of approximately three years) named as beneficiary; that defendant desired the policy changed so as to substitute himself or himself and daughter as beneficiary; that immediately after the death of deceased, the beneficiary not having been changed, defendant desired the proceeds of the policy placed in his custody for the purpose, stated by defendant, of creating a trust fund for his daughter and for use by himself in a business venture; and that defendant had become infatuated with Mary Adams, cousin of deceased, and was also associating with another woman at times.

A number of witnesses testified to statements made by defendant concerning his wife's death. Their testimony was to the effect defendant stated he arrived home from work about 5:15 P. M. Monday, March 4, 1935, went into the house, saw his wife on the couch having convulsions, didn't go to her but ran out of the house to have a doctor called; that he told Miss June Miles, who worked at a nearby lunch stand, to call Dr. Beatie; that he returned to his home, saw Miss Bessie Huff, a next door neighbor, and had her call Dr. Beatie. Miss Miles testified she was late to work on the day in question; that as she was going to work defendant called to her to "call Dr. Beatie right away;" "tell him to hurry;" that the electric clock in the lunch stand was 6:14 P. M. when she went in to call the doctor. Miss Huff testified she quit work at 6 P. M. and went directly home; that when she was at the door of her garage defendant asked her to call Dr. Beatie quickly, saying "Irene was dying;" and asked her to come over; that she called Dr. Beatie and went over to defendant's home; that deceased was having convulsions when she arrived and died about thirty minutes later; that the only words uttered by deceased were "I can't move" and, in response to witness' admonition to be quiet, she was better: "no" and "I am warm," making no statement as to how her condition came about; that defendant told witness "she took a dose of salts and threw up her hands and went to screaming." Dr. Beatie testified that he received two telephone calls and, upon arriving at the

Hancock home, found Mrs. Hancock unconscious, having convulsions; that she died as he was preparing to give her a hypodermic; that defendant stated he and his wife had been getting along fine, "she hadn't taken anything only some salts;" that he called for the salts and defendant brought him a paper bag labeled "Epsom salts;" "that he tasted the contents and it was salts." That evening defendant picked a glass, which had a whitish sediment in it, up from the cabinet and said to a Mrs. Elliott: "Say, Elsie, she has taken a dose of salts today," and turned on the faucet and rinsed the glass. This glass is not mentioned in the testimony of Dr. Beatie or Dr. George, the coroner, who made an investigation that evening; but defendant stated to another witness that Dr. Beatie and he had looked at the glass and decided it contained salts. Defendant made statements to witnesses that either Mr. or Mrs. Lewis Adams, parents of deceased, who had been living at defendant's home, had been taking strychnine tablets for heart trouble; that the tablets had been left in the house upon their departure; that deceased had been taking reducing tablets but he had prevailed upon her to discontinue the tablets and take salts instead; and that the strychnine tablets were small, flat shaped, round, white tablets and the reducing tablets were round and larger, brown tablets. Dr. George, in company with defendant, made a search of the place but found no strychnine.

Mary Adams testified she was a cousin of deceased; that she lived with deceased and defendant from October, 1934, until some time in February, 1935; that Mr. and Mrs. Adams were living at defendant's home when she came (and we gather from other testimony that the parents went to Florida prior to the death of their daughter); that defendant and deceased had frequent and sometimes violent quarrels; that defendant made fun of the parents, their religion and deceased's religion, told deceased he "thought lots of" a Helen Lewis and was seeing her, wanted and urged deceased to secure a divorce; that deceased did not want a divorce; that, answering defendant during one of the quarrels, deceased said: "Well, if you will get the poison I will take it," but, to witness' knowledge, never made any reference to suicide but the one time and that when witness departed both defendant and deceased wanted her to remain.

There was evidence that on two occasions deceased sought refuge in the home of Miss Huff and, a short time before her death, consulted Dr. Beatie concerning the actions of her husband.

George Stewart, who sometimes sold automobiles, testified that in a conversation with defendant about two or three weeks prior to his wife's death, defendant stated "I can't buy a car now. I would like to have one, but I can't buy one on account of my old lady. Believe me, I am going to be a single man before long." Upon being asked what he was going to do with his wife, defendant said: "I am going to send her to Florida to her people and let them do

whatever they want to." Shortly thereafter defendant, while look-ing at some cars at the motor company's place of business, remarked to Stewart: "I can't buy now but I will see you in about thirty days."

Mrs. W. L. Duncan, a neighbor, testified that deceased informed her defendant was going to Kansas City and she stayed with deceased the Saturday night preceding her death; that about 10:00 A. M. Sun-day defendant came in, appeared very nervous, stated he had not gone to Kansas City but had gone to Bronaugh, the home of Miss Adams. Miss Adams testified defendant came to her home on the Saturday in question, stating he had been to Kansas City, and that Bronaugh was off the direct Springfield-Kansas City route.

Defendant shipped his wife's body to Florida, accompanying it.

Among other statements attributed to defendant were statements to the effect he had been looking for the insurance policy but had not found it; that he did not want the body removed from the home; that he was going to seal the vault; that the doctors had told him nobody could blame him for what happened; that they had the insurance policy in Florida and would not let him have it; and, when accused by deceased's father that he had murdered his daugh-ter, "Well, you can't prove it."

Upon defendant's return to Springfield, he was held for investi-gation. We shall not detail the statements made by defendant to the officers. They were to the following effect: That defendant and his wife had been getting along as well as any married couple could; that he had not been out of town for three weeks prior to his wife's death; that when he arrived home at 5:15 P. M. March 4, 1935, he heard his daughter crying, stepped in the room, saw his daughter standing by his wife, who was on the couch in convulsions; that he ran out to have the doctor called, saw Miss Huff was not home, went to the lunch stand and told Miss Miles to call Dr. Beatie; returned and Miss Huff had arrived home; that they went into the house and his wife was still unconscious; that he asked her if she had taken anything and "she said, salts;" that he found a glass by the sink with about an inch of something in it; that he drank it but upon being questioned changed the statement to the effect he merely tasted it, and it was salts; that he had been unable to find the in-surance policy; that his wife's health was good and he couldn't be made to believe she committed suicide; that his wife may have taken strychnine tablets by mistake for the reducing tablets, or that possibly some poison could have gotten in the salts she took. When defendant was confronted with the discrepancy in time between his statement and the time given by Miss Huff, he became very nervous, and said "I just can't explain it," and walked the floor. Several hours later defendant stated his previous statements were not true and he wanted to correct them. He then informed the officers that

when he arrived home at 5:15 his wife was washing the baby's clothes and he started to get supper; that she finished and complained she wasn't feeling good and said she believed she would take some salts; that she prepared a dose of salts, drank it, took the clothes to the basement, hung them out and came upstairs and said her stomach was hurting her; that she stayed there a short time and then went in and laid down on the couch and started having convulsions.

There was an abundance of testimony, corroborated by defendant's statements, that up to the day of her death Mrs. Hancock had been in good health and, with the exception of the quarrels with defendant, in good spirits.

The testimony established that strychnine is one of the bitterest substances known; that it is soluble; that a quarter of a grain has been known to be fatal; that a grain or a grain and a half is considered fatal; that it will make its presence manifest in fifteen to twenty minutes, and that the time necessary to produce death varies but usually occurs within two hours.

Testimony bearing on the merits of the case on behalf of defendant was limited to defendant's denial of preparing or administering any strychnine poison to deceased.

■ The quantum of circumstantial evidence sufficient to meet the requirements of the rule announced in many cases [see, among others, State v. Wolff, 337 Mo. 1007, 1018, 87 S. W. (2d) 436(1), and cases cited l. c. 443] that to sustain a conviction on circumstantial evidence, the circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and inconsistent with the hypothesis of defendant's innocence, and every other rational hypothesis except that of guilt [see 16 C. J., p. 763, sec. 1568, treating of the weight and sufficiency of circumstantial evidence, and p. 1011, sec. 2436, treating of instructions on circumstantial evidence] differs in different cases and is not a fixed, hard-and-fast rule [State v. Concelia, 250 Mo. 411, 424, 157 S. W. 778, 781; State v. Smith (1931), 329 Mo. 272, 280, 44 S. W. (2d) 45, 48(4), quoting State v. Glahn (Banc, 1888), 97 Mo. 679, 689(1), 11 S. W. 260, 263; "The rule, even in criminal cases, is that, before this court will relieve on the ground that the verdict is not supported by the evidence, there must be either a total failure of evidence, or it must be so weak that the necessary inference is, that the verdict is the result of passion, prejudice or partiality." State v. Oertel, 280 Mo. 129, 137 (3), 217 S. W. 64, 66 (2).] After a careful consideration of the evidence, taking that testimony offered by the State and tending to implicate defendant as true and indulging in the legitimate inferences to be drawn from such testimony, we are of opinion there was sufficient evidence to make a submissible case, although, at the same time, of the opinion that a more detailed development of facts would

have eliminated some of the hesitancy under which we have reached the stated conclusion.

If the jury believed the State's evidence the only reasonable conclusion it could reach was that Mrs. Hancock, the mother of a three year old daughter, in good health and in good spirits, not despondent, did not intentionally destroy herself; and the differences in the size, shape and color of the strychnine tablets and reducing tablets authorized a finding that she, in the daytime, did not accidently take such a quantity of the strychnine tablets as was necessary to produce death thinking she was taking a reducing tablet or tablets. The impracticableness of such an accident is further accentuated when one considers that the evidence establishes she took Epsom salts. Defendant's own statements establish his access to strychnine and in this respect meets the statement found in State v. Hyde, 234 Mo. 200, 241, 136 S. W. 316, 327, 328: "In all cases of murder by poison it is considered important, if not necessary, to trace poison into the possession of the accused, or at least show that he had access to it." [State v. Smith (Mo.), 222 S. W. 455, 459.] ■ Motive, an essential factor in the instant case, was sufficiently established, and justified the inference, if the jury believed the State's evidence, that the death of deceased was the result of an intent to consummate the motive or motives prompting the act. There was testimony establishing that defendant and deceased quarreled; that he desired himself substituted as the beneficiary or one of the beneficiaries in the insurance policy and subsequent to the death of deceased sought control of the proceeds of said policy; that he was associating with other women; that he wanted a divorce; that he stated he would be single before long; that he could not purchase an automobile on account of his wife but would see the salesman in about thirty days; that he did not want the body removed from the home; that he destroyed the contents of the glass containing the "salts" taken by deceased; that he intended sealing the vault; and that he stated the doctors informed him no one could blame him. These and, among other factors, his contradictory statements, his failure to account for occurrences happening between 5:15 P. M. and approximately 6:14 P. M. after his arrival home until confronted by the officers therewith, and his actions thereupon and statement subsequent thereto are circumstances from which the jury was warranted in arriving at a verdict of guilty. We are of opinion the evidence establishing defendant's criminal agency in the instant case equals that in the Concelia, Smith, Glahn, supra, and other cases, and meets the requirements of the rule stated in 16 Corpus Juris, supra. [See, among others, State v. Bauerle, 145 Mo. 1, 19(5), 46 S. W. 609, 613(5) ; State v. English, 308 Mo. 695, 704, 274 S. W. 470, 472(3).]

█ Defendant contends the statements made by defendant to the officers were inadmissible; because, so far as supported by the record, defendant was in the custody of the officers [State v. Thomas, 250 Mo. 189, 210, 157 S. W. 330, 337(12); State v. McGuire, 327 Mo. 1176, 1184(2), 39 S. W. (2d) 523, 525(6, 7); State v. Johnson, 316 Mo. 86, 92, 289 S. W. 847, 848(4); State v. Seward (Mo.), 247 S. W. 150, 153(5)] and the officers told him it was best to tell the truth [State v. Tharp, 334 Mo. 46, 54(8, 9), 64 S. W. (2d) 249, 254(9, 10), reviewing the cases]. It appears that defendant was told by the officers that if he was innocent it was best to tell the truth. At the same time he was told that he had a right to decline to discuss the matter; that he would not be asked to talk unless he talked of his own free will, and that he would not be mistreated if he declined to talk. Under the authorities indicated, the statements, had they contained direct admissions of guilt, would have been admissible.

█ Complaint is made that the instruction on circumstantial evidence is insufficient. It required that the testimony must not only clearly and satisfactorily prove the circumstances, but that it must also exclude any reasonable hypothesis of innocence and leave no reasonable doubt of guilt; and that if the circumstances could be reconciled with any theory other than guilt as charged or permit of any reasonable doubt of guilt, defendant should be acquitted. We think it sufficiently embodied the requirements mentioned in 16 Corpus Juris, 1011, section 2436, in State v. Wolff, supra, and cases there cited. [See State v. English, 308 Mo. 695, 707(4), 274 S. W. 470, 473(9); State v. Barker, 322 Mo. 1173, 1179(2), 18 S. W. (2d) 19, 21(2); State v. Heusack, 189 Mo. 295, 313(3), 88 S. W. 21, 27(3).]

█ Defendant attacks an instruction on statements made by defendant, especially that portion thereof advising the jury that what defendant said against himself the law presumes to be true unless negatived by other evidence because said against himself, and the court's failure to instruct the jury that said statements, in order to be accepted as true, must have been voluntarily made. The State, merely mentioning an instruction on the voluntary nature of the statements to be unsupported by the evidence, contends such an instruction involved a collateral matter on which the court was not required to instruct in the absence of a request [citing Sec. 3681, R. S. 1929, Mo. Stat. Ann., p. 3227; State v. Baker (Mo.), 278 S. W. 987, 989(2); and State v. Hayes (Mo.), 262 S. W. 1034, 1036(5)]; although State v. Thomas, 250 Mo. 189, 210, 215, 216, 157 S. W. 330, 337, 338(19), was reversed because, under the facts of that case, an instruction similar to the one here under consideration omitted telling the jury they should disregard the statements if they believed they were not voluntarily made. We think we need not concern ourselves with this phase of the issue for our more recent

cases hold the giving of the instruction, especially the part mentioned in defendant's motion for new trial, reversible error. [State v. Duncan, 336 Mo. 600, 612(6), 80 S. W. (2d) 147, 153(15) (the instant instruction conforming to the instruction there set out); State v. Johnson (Banc), 333 Mo. 1008, 1013, 63 S. W. (2d) 1000, 1003 et seq. (questioning the Hayes case). State v. Thomas, supra, questioned the propriety of the instruction.]

▉ Defendant asserts error in the court's refusal to instruct on manslaughter. The State proceeded upon the theory defendant poisoned his wife. [Sec. 3982, R. S. 1929, Mo. Stat. Ann., p. 2778.] The defense was that defendant did not poison his wife. There was no substantial evidence upon which to base an instruction that defendant deliberately assisted his wife in the commission of self-murder [Sec. 3989, R. S. 1929, Mo. Stat. Ann., p. 2796], and an instruction on manslaughter was not called for under the evidence [State v. Fitzgerald, 130 Mo. 407, 436, 32 S. W. 1113, 1120; State v. Jackson (Mo.), 48 S. W. (2d) 936(1); State v. Bartley, 337 Mo. 229, 236(5), 84 S. W. (2d) 637, 640 (8)].

▉ We are not prepared to say that, even had timely and proper objection or motion to strike on the ground of remoteness been interposed, the trial court abused its discretion in admitting the testimony of witness Sweeting covering conversations with defendant a year or so prior to the death of deceased with reference to defendant's desire to obtain a loan on the policy of insurance upon the life of deceased that he might engage in business in view of the further testimony that immediately subsequent to the death of deceased defendant desired control of the proceeds of said policy and the use of a portion thereof to engage in business. [See 16 C. J., p. 561, sec. 1087; and the observations in State v. Fenley, 309 Mo. 520, 532(5), 275 S. W. 36, 40(8).] We think the testimony sufficiently connected with the principal fact on the issue of motive.

▉ The officers present at the time defendant narrated the occurrences connected with his wife's death to the officials testified concerning oral statements made by defendant. It appears, however, that after defendant would state what occurred, the statements were dictated to a stenographer, reduced to writing and signed by defendant. At the beginning of the cross-examination of the last officer on the stand counsel for defendant requested that he be permitted to see the written statements. So far as disclosed by the record no use was made by the State of any written statement made by defendant and the officers did not purport to give the contents of the written statements. Under the record made and the circumstances of the case, we think the court is not to be convicted of error in denying the request.

■ The defendant took the stand but his testimony was limited. In the argument of the State's attorneys comment was made upon defendant's failure to explain certain facts. There was no error in overruling defendant's objections to such comment. [State v. Larkin, 250 Mo. 218, 234(3), 157 S. W. 600, 604(4); State v. Emry (Mo.), 18 S. W. 2d) 11, 13(7); State v. Drew (Mo.), 213 S. W. 106, 107(5).]

■ Another assignment covers an objection to the effect it was error to permit a physician to answer a hypothetical question as to the cause of the death. It is without merit. [State v. Douglas, 312 Mo. 373, 401, 278 S. W. 1016, 1025(18).]

We find the other assignments without merit. Some are unsupported by the record; some are likely not to recur upon retrial, and some are too general to call for review.

The information appears sufficient in substance and form.

The judgment is reversed and the cause remanded. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.