244 S.W.2d 98 (1951)
STATE
v.
FLETCHER.
No. 42572.
Supreme Court of Missouri, Division No. 2.
December 10, 1951.
*99 Claude T. Wood, Richland, Lauf & Bond, H. P. Lauf and John O. Bond, all of Jefferson City, for appellant.
J. E. Taylor, Atty. Gen., Robert L. Hyder, Asst. Atty. Gen., for respondent.
WESTHUES, Commissioner.
Appellant Fletcher and Oris Massey were jointly charged with having robbed one Sam Hickman of $560. The information alleged that the crime was committed by use of a dangerous and deadly weapon. The charge was, therefore, robbery in the first degree, as defined in Sections 560.120 and 560.135, R.S.1949.
The alleged crime was committed in Laclede County, Missouri. A change of venue was granted and the case was transferred to Phelps County. The regular judge was disqualified and the Honorable Tom R. Moore, Judge of the 31st Judicial Circuit, was called to try the case. A severance was granted. Oris Massey was convicted and received a sentence of fifteen years' imprisonment in the State Penitentiary. The judgment was affirmed by this court in State v. Massey, 358 Mo. 1108, 219 S.W.2d 326. Appellant was tried in April, 1950, resulting in a verdict of guilty and a sentence of twenty years' imprisonment in the State Penitentiary. From the sentence an appeal was granted to this court.
*100 In view of the issues presented on this appeal it will be necessary to make a rather detailed statement of the evidence connecting appellant Fletcher with the commission of the crime.
Appellant briefed the following points: That this is a capital case and, therefore, the trial court erred in permitting the jury to separate during the recesses of the trial before the case was finally submitted to the jury; that the State's evidence did not show that a stone was used in the robbery and, therefore, it was error to submit the case on that theory; that the charge of robbery in the first degree without the use of a deadly and dangerous weapon should have been submitted to the jury; that the closing argument of the prosecutor was highly inflammatory and prejudicial; and that the trial court erred in not giving defendant's instruction pertaining to circumstantial evidence.
The State produced evidence which justifies the following narration of the alleged crime and Fletcher's connection therewith: The victim of the robbery, Sam Hickman, lived in Laclede County on a farm near Competition. On the evening of January 9, 1946, Tom Brackett and his wife, neighbors of Hickman, were at the home of Hickman visiting Mrs. Hickman who was ill. About 6:15 P. M. Oris Massey appeared at the door and, stating that he had car trouble, asked for a lantern. Hickman gave him a lantern and Massey left. In a few moments he returned, stated his car was in a ditch, and asked Hickman if he would help him. Hickman and Brackett went with Massey to the car which was parked on a public road only a short distance from the Hickman home. When these parties neared the car they noticed Hickman's lantern was standing near the front of the car and a man was bending over the engine of the car with his head under the hood. Hickman took the lantern and approached the place where the man was bending over the engine intending to give some aid with the lantern. When Hickman was a few feet from the front of the car, the man at the engine suddenly turned and struck Hickman, knocking him down. Since the point is made that the State failed to prove a stone was used, we quote from the evidence given by Hickman and Brackett. Hickman testified as follows:
"Mr. Bradshaw: Q. Did you find a man with his head under the front hood of the car? A. Yes, sir.
"Q. All right. When you brought the lantern around to give him a light, what did the man under the hood of the car do? A. He come out from under it and knocked me in the head.
"Q. Do you know what he hit you with at first? A. No, I don't.
"Q. And where did he strike you? A. Right up over on this eye.
"Q. What happened to you? A. I wenthe just knocked me a winding, knocked me out.
"Q. Did you come to later? A. Yes, sir.
"Q. Where did you find this man when you came to? A. He had me down and on top of me with his knees.

* * * * * *
"Q. Now then, tell the jury if you remember whether or not you were struck any after you were down on the ground. A. He struck me with a rock or something, broke my jaw in three places.
"Q. Where did he break your jaw, tell the jury where it was broken. Now you are pointing to the right side? A. Yes, sir.
"Q. All right. Now where else? A. And over here.
"Q. That is over on the left side? A. And then about the center.
"Q. And about the center? A. Yes, sir.

* * * * * *
"Q. Do you know when the man finally got off of your chest with his knees? A. I was knocked out. I didn't knowI didn't even know when the car left.
"Q. Didn't know that? A. No, sir.
"Q. When did you finally regain consciousness? A. Well, I don't know when I gained consciousness. I got up and Brackett was standing up in the road bloody as a hog and I says, `What's the matter *101 with you, Tom.' He says, `Nothing, he knocked me in the head with a pistol.'"
Tom Brackett's testimony was the following:
"Q. Did you see him hit your brother or brother-in-law? A. Yes, but he had his back to me when he hit him.
"Q. What did he hit him with? A. He hit him with his fist and knocked him down.
"Q. Did you see him thereafter hit your brother-in-law again? A. Yes, I seen him hit him a time or two after he got him down and got on him.
"Q. Did you see what he hit him with? A. Well, I couldn't tell what it was.
"Q. What did it look like? A. Well, it looked like a rock more than anything else. I couldn't tell anything about what it was.
"Q. Tell the jury whether or not you went out there a couple of days later and found an object out there at that place where he had been struck with blood on it. A. I found a rock out there.
"Q. Did it have blood on it? A. Yes, sir.
"Q. About how big a rock was it? A. Oh, it was about that long, (Indicating) I guess something like that.
"Q. Well, now you say that long. For the purpose of the record, about how long is that? A. Well, about five or six inches." As to what Massey did, Brackett gave the following account:
"Q. When this man came out from under the hood and struck your brother-in-law, Mr. Hickman, and knocked him down, what did you do? A. Well, Massey come up to the side of me, I started to run down there and Massey hit me with the gun and knocked me over in the ditch.
"Q. Where did he strike you with the gun? A. Right up there. (Indicating)
"Q. After he knocked you down in the ditch, how far would you have been from your brother-in-law and the man who was on him hitting him with this object? A. Oh, I guess I was twelveten or twelve feet, something like that.
"Q. Where you close enough to see what the man was doing to your brother-in-law?
A. No, I couldn't tell what he was doing; he was on him and grabbing at his clothes up here. (Indicating)
"Q. What did Massey do after he hit you with the pistol and knocked you in the ditch? A. He throwed the gun on me and says, `I have a notion to blow your damn brains out.'"

* * * * * *
"Q. What did he say to the other fellow who wasand in the presence of the other fellow, who was beating your brother-in-law? A. Says, `Beat his damn head off.'"
The evidence was that Hickman had a wallet in the bib of his overalls containing twenty-five $20 bills and six $10 bills. This was taken from him while he was on the ground near the car. The evidence further showed that Hickman was seriously injured. He spent some time in a hospital and his hearing was permanently impaired. Hickman at the time was 74 years old and Brackett 68.
The car used by the perpetrators of this crime belonged to appellant's brother, Fred Fletcher. A witness, Dorothy Kelley Pearman, testified that she went to Hartville, Missouri, with appellant and Fred Fletcher on the morning of January 9 and while there appellant borrowed some small change from his brother Fred. She testified that they returned to Lebanon and while there between two-thirty and three o'clock appellant and Oris Massey borrowed the car and she saw them get into the car and drive away. Her testimony was that she and Fred went to a motion picture show that evening and about nine o'clock appellant came to them in the show and informed them where the car was parked and asked them to meet them after the show at the Lucky 3 beer tavern; that after the show they went to the Lucky 3 beer parlor and found appellant, Massey, and a girl sitting in a booth; that they joined them and were invited to have a drink; that appellant said to the waiter he had better "come and get" his last $10 bill; that the waiter took a bill from appellant and returned some change. About that time the chief of police of Lebanon and a police officer came into the building and arrested appellant and Massey. The evidence showed that after they left the building the officers made a search of *102 appellant and Massey to see if they had any weapons; none was found. No thorough search was made. The police did find between $8 and $9 on appellant. Fletcher and Massey were marched to a police car with the police following them. Massey got into the car first and then appellant. A witness testified that as the second man got into the car, he saw him make a downward motion with his left hand. He stated that as the car was driven away, he noticed what seemed to be pieces of paper scatter along the sidewalk by the suction created by the car's movement. He and another man investigated and found eleven $20 bills and two $10 bills. These they turned over to the sheriff.
The evidence disclosed that Fletcher and Massey were questioned by the sheriff and a highway patrolman. Each testified that appellant and Massey claimed they had been together all evening and had not been out of Lebanon; that they had spent the time in beer parlors.
The key to the car belonging to Fred was found in appellant's pocket. That this car was used by the perpetrators of the robbery was proven beyond any question; that Massey was one of the guilty parties was shown beyond a doubt.
After the robbery Hickman and Brackett returned to the Hickman home, sent for help, and were taken to a hospital in Lebanon. The sheriff was notified and he in turn notified the highway patrolman Taylor. Taylor was not on duty and did not have on his uniform. The sheriff and Taylor went to the hospital and questioned Brackett. Hickman was not in a condition to be questioned very much. Brackett was hesitant in answering questions by Taylor and finally asked to speak to the sheriff in private. This request was granted and immediately thereafter the sheriff got in touch with the police and instructed them to arrest Massey and Hayward Fletcher.
At the time of the robbery it was rather dark, being after six o'clock in the evening on January 9. Hickman and Brackett recognized Massey when he came to the Hickman home. Neither positively identified Fletcher. Both Hickman and Brackett testified that they did not get a good look at the man who struck and robbed Hickman. They had known Fletcher and they stated the man who robbed Hickman resembled Fletcher. Their testimony as to the wearing apparel worn by the alleged robber coincided with what Fletcher was wearing when arrested.
The defendant did not introduce any evidence except that he denied the commission of the offense.
Appellant, with reference to the separation of the jury before the submission of the case to the jury, cited many cases among which was a recent case by this court, State v. Bayless, Mo., 240 S.W.2d 114, loc. cit. 122(10-13). The rule as consistently followed was said to be: "In construing these sections (Secs. 546.230, 546.240, and 547.020, R.S.1949) this court has held that, where the separations have taken place before submission, the burden rests upon the State to affirmatively show that the jurors were not subjected to improper influences during the separations to the prejudice of the defendant, while, if the separation occurred after submission, a new trial is required regardless of any actual misconduct of the jury to the prejudice of the defendant." In State v. Boone, 355 Mo. 550, 196 S.W.2d 794, a capital case, also cited by appellant, the jury was permitted to separate by consent of all parties. The court held the burden was on the State to show no prejudice resulted. Did the State sustain the burden in this case? We think so. The trial court heard evidence on the question and the jurors were examined and cross-examined. If the evidence of the jurors is believed, and the trial court evidently did so, then the jurors were not improperly influenced. The court had instructed the jurors rather emphatically as to their actions when separated during the recesses of the court. The jurors as shown by their evidence followed the instructions meticulously. On cross-examination of the jurors, it was shown that a number had learned that Massey was at the courthouse and had been brought there from the State Penitentiary. A number thought they had *103 learned that fact during the trial. Massey was at the courthouse in the custody of officers, having been brought there at appellant's request. However, it was brought out at the trial by appellant's attorneys in cross-examination of witnesses that Massey had been convicted. One of appellant's attorneys in his argument to the jury stated that Massey was now paying the penalty for the robbery. It seems to have been conceded that Massey was guilty and had been tried and convicted. One of the attorneys for appellant testified that he agreed to the separation of the jury. We rule the trial court was justified in overruling appellant's contention.
Appellant under three separate headings briefed the question of the sufficiency of the evidence that a stone was used in the commission of the offense. We treat these as one question. The robbery in this case was beyond a doubt perpetrated by means of a deadly and dangerous weapon. Massey used a firearm when he struck Brackett and then held the gun over him to prevent his going to the aid of Hickman. Massey threatened to blow out Brackett's brains and called to his companion who was beating Hickman to "Beat his damn head off." However, the instruction submitted the case to the jury on the question of whether a stone was used. We must say that the evidence left no doubt on that question. Hickman testified that he was struck with a rock or something and that his jaw was broken in three places. Brackett's testimony was that the object in the robber's hand "looked like a rock more than anything else." Later a rock stained with blood was found at the place where the assault was committed. The jury also had the right to consider the extent of the injury as a circumstance that something more than a bare fist was used. We hold that the evidence was ample to sustain the charge. With no evidence to the contrary, the court was justified in submitting the case to the jury on the theory that a deadly and dangerous weapon was used and since there was no evidence to justify an instruction on a lesser degree of crime, the court did not err in not submitting such an issue to the jury.
It is urged that the trial court gave an instruction on circumstantial evidence which was insufficient. The instruction reads as follows:
"Where it is sought to convict a person of crime, by circumstantial evidence alone, in order to convict, the circumstances proven by the State, must be consistent with each other, and wholly inconsistent with the innocence of the accused, and incapable of explanation upon any other reasonable theory, except that of his guilt.
"And in this case if the circumstances proven by the State, can be explained upon any other reasonable theory, except on that of Defendant's guilt, you should find him not guilty."
The court also gave an instruction on reasonable doubt. We deem the instruction on circumstantial evidence sufficient and a correct declaration of the law. 23 C.J.S., Criminal Law, § 1251, page 814; State v. Barker, 322 Mo. 1173, 18 S.W.2d 19, loc. cit. 21(2); State v. Hancock, 340 Mo. 918, 104 S.W.2d 241, loc. cit. 245(5); State v. Hardy, 326 Mo. 969, 34 S.W.2d 102, loc. cit. 103(2, 3).
We now come to the assignment of error pertaining to the argument of the special prosecutor. In the motion for new trial, appellant made the following assignment of error: "The Court committed prejudicial error in permitting Mr. Bradshaw, special counsel for the State, in his closing arguments to the jury, over the objection of the defendant, to tell the jury and to indicate to the jury that the inhabitants of Laclede County would be in danger of their lives if the defendant was acquitted because such statements were not invited by anything brought out by the defendant, were highly prejudicial and inflammatory, were not made in good faith, and the court erred in overruling the defendant's objection thereto and in denying defendant's request for a mis-trial and to discharge the jury; and the court further erred in permitting special counsel for the State, over the objections of the defendant, to make numerous other statements of a highly inflammatory character tending to argue that the defendant was a violent and dangerous *104 character, all of which was without the record and not justified by any testimony or any action of the defendant or his counsel inviting such argument."
The record as to the first complaint in the above assignment shows the following to have occurred:
"Mr. Bradshaw: * * * The State of Missouri has a right to protect this old man here, because if he isn't safe, I'm not safe; and if I'm not safe, you're not safe. Now, the time has passed in this country when we have got to live with a gun right at our elbow, we don't want to live like that in Laclede County; we have no right to live that way.
"Mr. Breuer: Now, just a minute, I want to make an objection to that line of argument as being entirely improper; it is for the purpose of prejudicing the men on the jury; it is a threatening to the jury as to what will happen to them.
"Mr. Bradshaw: I'm not threatening.
"The Court: It goes on what the Supreme Court says,a certain thing. Objection overruled.
"To which ruling of the Court the defendant, by his counsel, then and there duly excepted and at the time saved his exceptions.
"Mr. Bradshaw: You men know that I'm not threatening you tonight. What would I threaten you with? We are here from our community, we're not threatening you, we're asking you to do something for us, to do what is right; we are asking you to do what is right. Now, do you call that a threat? Since when is it a threat to ask a jury to do what is right under the evidence in this case? Now, is there any threat on that? I am down here today, I have got a right to have my family protected, you have got a right to have yours and Mr. Breuer has got a right to have his, and if we can't have law enforcement we can't have it. * * *"
A prosecutor has the right to urge a jury to do its duty and to protect society by enforcement of the law. 23 C.J.S., Criminal Law, § 1107, page 583; State v. Carter, 345 Mo. 74, 131 S.W.2d 546, loc. cit. 548(5, 6); State v. Martin, Mo., 56 S.W.2d 137, loc. cit. 141(15-17); State v. Greer, 321 Mo. 589, 12 S.W.2d 87, loc. cit. 91(7, 8).
The complaint made in the second portion of the assignment that the prosecuting attorney argued that the defendant was a violent and dangerous character is not supported by the record. Appellant in his brief failed to point to any portion of the argument to sustain such a complaint. We, therefore, must rule the point against appellant.
While the motion for new trial made no mention of it, appellant says in his brief that the special prosecutor stated, "In Laclede County we get to know people," insinuating there was something that the State could not show. The record does not support appellant.
Appellant's lawyers, three of them, made arguments to the jury. In their argument they urged the jury not to deprive appellant of his liberty or "fritter away his honor or his integrity." They also commented on the fact that appellant denied he was the one with Massey when Hickman was robbed. They asked what else could appellant say? What more could he do? To this the prosecutor answered as follows: "Mr. Bradshaw: Now, then, what do these gentlemen want to do? Yes, sir, in communities like Phelps County and Laclede, we do come to know these people; he is from Laclede County, he is from Laclede County, and in all the people over there they haven't called one single witness from Laclede County who would come down here to testify about where he was on the night that this happened, they haven't called one. Does that ring a bell in your mind? * * *" We see nothing improper in that argument. Appellant says the argument was highly inflammatory and prejudiced the jury against appellant.
With reference to the jury's being prejudiced we desire to comment. The evidence while circumstantial left no doubt as to appellant's guilt. The crime itself was committed in a most brutal and inhuman manner. Not only did Massey and appellant rob Hickman, an old man, they unnecessarily beat him and seriously injured *105 him. A twenty-year sentence for such a crime does not disclose passion or prejudice on the part of the jury. The judgment is affirmed.
BOHLING and BARRETT, CC., concur.
PER CURIAM.
The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court.
All concur.